[No. A127776. First Dist., Div. Two. July 8, 2011.]

SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 1000, et al.,
Plaintiffs and Respondents, v.
EDMUND G. BROWN, JR., as Governor, etc., et al., Defendants and
Appellants.

COUNSEL

Kronick, Moskovitz, Tiedemann & Girard, David W. Tyra, Kristianne T. Seargeant and Meredith H. Packer for Defendant and Appellant Edmund G. Brown, Jr., as Governor.

K. William Curtis, Warren C. Stracener, Linda A. Mayhew, Will M. Yamada and Jenny L. Esquivel for Defendant and Appellant Ronald Yank, as Director of the Department of Personnel Administration.

Kamala D. Harris, Attorney General, Ross C. Moody, Deputy Attorney General; Remcho, Johansen & Purcell and Robin B. Johansen for Defendant and Appellant John Chiang, as Controller.

Kamala D. Harris, Attorney General, and Ross C. Moody, Deputy Attorney General, for Defendant and Appellant Kamala D. Harris, as Attorney General.

Jerry Whitfield for Defendant and Appellant Dave Jones, as Insurance Commissioner.

Reed Smith, Harvey L. Leiderman and Jeffrey R. Rieger for Defendants and Appellants California's Public Employees' Retirement and California State Teachers' Retirement System.

Strumwasser & Woocher, Michael J. Strumwasser and Jonathan David Krop for Defendant and Appellant California Earthquake Authority.

Manatt, Phelps & Phillips, Benjamin Gross Shatz and Ronald B. Turovsky for Defendant and Appellant California State Lottery Commission.

Paul E. Harris III, J. Felix De La Torre and Monica Ahuja for Plaintiffs and Respondents.

OPINION

**RICHMAN, J.**—This is an appeal by the Governor, the Director of the Department of Personnel Administration (DPA), and dozens of state government entities (collectively, the Governor) from a judgment of the Alameda Superior Court issuing a writ of mandate as petitioned by Local 1000 of the Service Employees International Union (SEIU) on behalf of approximately 95,000 members employed by the State of California. The gist of the judgment was that the Governor's 2008 and 2009 Executive Orders instituting three mandatory monthly furlough days for state employees were declared

illegal as to certain groups of employees; the Governor and the Director were commanded to halt enforcement of the furlough program as to those employees; and the State Controller was directed to halt reducing those employees' salaries for the furlough days, as well as to "restore any salary wrongfully withheld as a consequence" of the Executive Orders.

The appeal was fully briefed when our Supreme Court decided *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989 [116 Cal.Rptr.3d 480, 239 P.3d 1186] (*Professional Engineers*), dealing with the legality of the Governor's 2008 Executive Order directing a mandatory two-day-a-month unpaid furlough. The court summarized its core holding as follows: "In mid-February 2009—shortly after the furlough program went into effect—the Legislature enacted, and the Governor signed, legislation that revised the Budget Act of 2008 (2008 Budget Act) by, among other means, reducing the appropriations for employee compensation contained in the original 2008 Budget Act by an amount that reflected the savings the Governor sought to obtain through the two-day-a-month furlough program. The February 2009 legislation further provided that the specified reduction in the appropriations for employee compensation could be achieved either through the collective bargaining process or through 'existing administration authority.' That phrase, in the context in which the revised budget act was adopted and in light of the provision's legislative history, reasonably included the furlough program that was then in existence and that had been authorized by the current gubernatorial administration. . . . Under these circumstances, we conclude that the Legislature's 2009 enactment of the revisions to the 2008 Budget Act operated to ratify the use of the two-day-a-month furlough program as a permissible means of achieving the reduction of state employee compensation mandated by the act." (*Professional Engineers, supra,* 50 Cal.4th 989, 1000.)

By the time *Professional Engineers* was filed, the Legislature had, after the Governor had issued the second Executive Order, revised the 2009 budget act (2009 Budget Act) using language virtually identical to that it used in revising the 2008 Budget Act. The relevant language of both revised budget acts specifies that "each item of appropriation in this act . . . shall be reduced . . . to reflect a reduction in employee compensation achieved through . . . existing administration authority . . . ." The Governor reads *Professional Engineers*'s construction of the "existing administration authority" language as a blanket legislative validation of the furlough program then in place, be it two or three days per month, with no exceptions. We conclude that this simplistic interpretation is not what the Supreme Court intended.

That said, we conclude that *Professional Engineers* is virtually dispositive. The scope of the furlough program that the Legislature was ratifying was

pegged to the presence of an "item of appropriation," as the Legislature's reiteration of the language construed in *Professional Engineers* demonstrates. Beyond this, we further conclude that the dispositive statutory language in both instances is "item of appropriation," because "existing administration authority" as shorthand for the furlough program then in place, has relevance only as a mechanism for effecting the Legislature's reduction of a given "item of appropriation." In other words, there must be an "item of appropriation" before the particulars of the furlough program become relevant.

Our independent research discloses that all but five of the state agencies and departments made defendants by SEIU are the subject of an "item of appropriation" in both the 2008 and the 2009 Budget Acts. The three-day-per-month furlough program is therefore valid as to these defendants. Because their inclusion was proper, their employees have no grievance, and no entitlement to backpay. Thus, as to 58 of the 63 defendants, the judgment must be reversed. As to the five remaining entities that have already implemented the full furlough program but are not named in an "item of appropriation," their inclusion cannot be deemed "mandated by the act" of the Legislature. However, given the virtual irrelevance of the record on appeal to the issues made dispositive in the wake of *Professional Engineers*, we remand in order that the parties may have the opportunity to present evidence as to whether the sources of funding for these entities are otherwise part of the budgetary process and therefore may be within the ambit of *Professional Engineers*.

## BACKGROUND

The financial woes of the state that generated the Governor's Executive Orders and the ensuing litigation—including this case—are too well known to require detailed reiteration. The history of the situation up to the issuance of the second Executive Order in 2009 is also set out in *Professional Engineers, supra*, 50 Cal.4th 989, 1001–1008. Only the salient highlights will be noted here.

On December 19, 2008, the Governor issued Executive Order No. S-16-08. Citing "an approximately $15 billion General Fund deficit for the 2008–09 fiscal year, which without effective action, is estimated to grow to a $42 billion General Fund budget shortfall over the next 18 months," he directed that "effective February 1, 2009 through June 30, 2010, the Department of Personnel Administration shall adopt a plan to implement a furlough . . . for two days per month, regardless of funding source" for "represented state employees," managers, and supervisors. Then, on July 1, 2009, because "California's revenues . . . continue to plummet," the Governor issued Executive Order No. S-13-09 which ordered the furlough program expanded

to three days per month for the period from July 1, 2009, through June 30, 2010, applicable to all state employees, whether "represented" or "non-represented," to include "supervisors, managers, and exempt state employees." The Governor reiterated that the additional day of furlough was to be imposed on employees "regardless of funding source."

In June 2009, SEIU, alleging that it represented approximately 95,000 state employees in nine bargaining units, brought suit alleging that the Executive Orders were "arbitrary, capricious and without a rational basis because they apply to employees whose salaries are paid by sources other than the General Fund, such as federal funds or special funds. In other words, the furloughing of employees in positions paid from sources other than the General Fund does not achieve the stated purpose of the Orders."[1] SEIU prayed for declaratory and injunctive relief, together with a writ of mandate commanding the Controller "to halt any further salary reductions which resulted from the . . . Orders, and to order back pay for any furlough dates previously implemented."

On December 31, 2009, the trial court issued its "Order Granting Petition For Writ of Mandate." The court's decision rested on two grounds. The first ground for finding the furlough program—and the Governor's Executive Orders—invalid was that the Governor "violated a mandatory duty" imposed by Government Code section 19851, subdivision (a), "to take into account the Agencies' 'varying needs' before reducing working hours."[2] Not only was the

---

[1] A word about the parties.

An individual state employee joined SEIU in her capacity as a taxpayer. In the interests of simplifying matters, this person will be subsumed in subsequent references to SEIU.

SEIU's original petition named 69 defendants, but this was reduced to 64 in the first amended petition. The 64 became 63 when one defendant was dismissed due to defective service. Apart from the Governor and Director of DPA, in its amended petition SEIU named as defendants the Controller, the Attorney General, and the Insurance Commissioner, although none of these constitutional officers played an active role in the litigation beyond filing an answer advising the court that they "take no position regarding the validity of the . . . actions" challenged by SEIU. Also named as defendants, in addition to the Director of DPA, were the heads of 58 other state agencies, authorities, boards, commissions, departments, and other entities, including the California Public Employees' Retirement System (CALPERS) and the California State Teachers' Retirement System (CALSTRS). Up to the time they filed a separate notice of appeal, these individuals had separate counsel, made their own filings, and, with two exceptions, stood beside the Governor throughout the proceedings in the trial court. Since this appeal got under way, all their briefs have been filed "jointly." The two exceptions were CALPERS and CALSTRS, which aligned with SEIU in arguing that the Governor lacked the unilateral power to furlough employees of these independent agencies.

[2] Statutory references are to the Government Code unless otherwise indicated. The cited statute provides: "It is the policy of the state that the workweek of the state employee shall be 40 hours, and the workday of state employees eight hours, except that workweeks and workdays of a different number of hours may be established in order to meet the *varying needs of the different state agencies.* It is the policy of the state to avoid the necessity for overtime

failure to comply with the mandatory duty an abuse of discretion, "when furloughs are implemented to save money, yet their implementation in some agencies saves nothing and increases costs, such a policy is arbitrary, capricious and unlawful."

The second ground for the court's decision was that "furloughing employees to increase potential borrowing from special fund agencies interferes with those agencies' operations," and thereby violated section 16310, subdivision (a), and again qualified as an abuse of discretion "by ordering and implementing furloughs in order to increase internal borrowing from special funds, without regard to whether such borrowing interfered with the objects for which the special funds were created."[3]

---

work whenever possible. This policy does not restrict the extension of regular working-hour schedules on an overtime basis in those activities and agencies where it is necessary to carry on the state business properly during a manpower shortage." (§ 19851, subd. (a), italics added.)

The trial court's analysis of this statute, and whether it could support the judgment, featured prominently in the parties' original briefs. The controversy became moot after the Supreme Court examined the statute and concluded that "just as section 19851, subdivision (a) cannot properly be interpreted *as authorizing* the Governor to impose the furlough here at issue, the provision also cannot properly be interpreted *as prohibiting* the Governor from imposing such a furlough. The statute simply does not address the furlough situation." (*Professional Engineers, supra*, 50 Cal.4th 989, 1029.) Thus, the issue of whether the trial court was right or wrong in its construction of section 19851, subdivision (a), is immaterial in light of the Supreme Court's conclusion that what truly mattered was the Legislature's passage of the revised 2008 Budget Act. In response to questioning by this court, the parties conceded as much.

[3] The cited statute provides: "When the General Fund in the Treasury is or will be exhausted, the Controller shall notify the Governor and the Pooled Money Investment Board. The Governor may order the Controller to direct the transfer of all or any part of the moneys not needed in other funds or accounts to the General Fund from those funds or accounts, as determined by the Pooled Money Investment Board, including the Surplus Money Investment Fund or the Pooled Money Investment Account. All moneys so transferred shall be returned to the funds or accounts from which they were transferred as soon as there are sufficient moneys in the General Fund to return them. No interest shall be charged or paid on any transfer authorized by this section, exclusive of the Pooled Money Investment Account, except as provided in this section. *This section does not authorize any transfer that will interfere with the object for which a special fund was created* or any transfer from the Central Valley Water Project Construction Fund, the Central Valley Water Project Revenue Fund, or the California Water Resources Development Bond Fund." (§ 16310, subd. (a), italics added.)

Effective February 20, 2009, the following provisions were added: "(c) Except as described in subdivision (d), all moneys in the State Treasury may be loaned for the purposes described in subdivision (a). [¶] (d) Subdivision (c) shall not apply to any of the following: [¶] (1) The Local Agency Investment Fund. [¶] (2) Funds classified in the State of California Uniform Codes Manual as bond funds or retirement funds. [¶] (3) All or part of the moneys not needed in other funds or accounts for purposes of subdivision (a) where the Controller is prohibited by the California Constitution, bond indenture, or statutory or case law from transferring all or any part of those moneys." (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 9, § 6.)

Although this provision was not considered in *Professional Engineers*, it is no more relevant than section 19581. Section 16310 deals with the transfers of funds, not the conditions of state

Questions arose thereafter concerning the scope of relief that the trial court would order. After hearing argument from the parties, and over the Governor's objections, the trial court on February 25, 2010, filed an "Order After Hearing" in which it determined that its decision would apply to all employees of the named departments and agencies regardless of whether SEIU represented them, and that the relief ordered would include backpay.

Also on February 25, 2010, the court filed its judgment directing issuance of a peremptory writ of mandate commanding (1) the Governor and the Director "to set aside the portions of the Governor's Executive Orders Nos. S-16-08 and S-13-09 calling for a furlough and resulting salary reduction for all employees of Respondent Departments and Agencies, and to cease and desist the furlough of such employees" and (2) the Controller "to immediately pay all employees of Respondent Departments and Agencies their full salary without any reductions pursuant to the illegal furloughs directed by the unlawful Executive Orders, and to take any and all actions required by law to restore any salary wrongfully withheld as a consequence thereof." The following day the Governor perfected this timely appeal from the judgment.[4]

In the wake of *Professional Engineers*, the parties filed supplemental briefs addressing that decision and its impact upon the arguments advanced in the briefs already on file.

## REVIEW

### *Professional Engineers* Establishes the Validity of the Third Furlough Day Imposed by the Governor's Second Executive Order and Ratified by the Legislature When It Enacted the Revised 2009 Budget Act

The ultimate fulcrum for the Supreme Court in *Professional Engineers* was this language in a provision of the legislation revising the 2008 Budget Act:

employment. Thus, like section 19581, section 16310 "simply does not address the furlough situation." (*Professional Engineers, supra*, 50 Cal.4th 989, 1029.)

[4] In addition to appealing from the judgment, the Governor purports to appeal from (1) the order overruling his demurrer; (2) the "Order Granting Petition For Writ of Mandate"; and (3) the "Order After Hearing" concerning the scope of the judgment. Although none of these orders is independently appealable because they are all interlocutory steps preparatory to the final judgment, they could be reviewed on this appeal from the judgment. (Code Civ. Proc., § 906; *In re Matthew C.* (1993) 6 Cal.4th 386, 393 [24 Cal.Rptr.2d 765, 862 P.2d 765]; *I. J. Weinrot & Son, Inc. v. Jackson* (1985) 40 Cal.3d 327, 331 [220 Cal.Rptr. 103, 708 P.2d 682].) The matter is largely academic due to our decision to reverse the judgment, but the purported appeals will have to be dismissed.

"[T]he legislation that revised the budget applicable to the 2008–2009 fiscal year (Sen. Bill 3X 2) effectuated a reduction in the appropriations for employee compensation by adding a provision to the 2008 Budget Act. (Sen. Bill 3X 2, § 36.)

"Section 36 of Senate Bill 3X 2 provides in full:

" 'Section 3.90 is added to the Budget Act of 2008, to read:

" 'Sec. 3.90. (a) Notwithstanding any other provision of this act, each item of appropriation in this act, with the exception of those items for the California State University, the University of California, Hastings College of the Law, the Legislature (including the Legislative Counsel Bureau), and the judicial branch, shall be reduced, as appropriate, to reflect a reduction in employee compensation achieved through the collective bargaining process for represented employees or through existing administration authority and a proportionate reduction for nonrepresented employees (utilizing existing authority of the administration to adjust compensation for nonrepresented employees) in the total amounts of $385,762,000 from General Fund items and $285,196,000 from items relating to the other funds. It is the intent of the Legislature that General Fund savings of $1,024,326,000 and other fund savings of $688,375,000 in the 2009–10 fiscal year shall be achieved in the same manner described above. The Director of Finance shall allocate the necessary reduction to each item of appropriation to accomplish the employee compensation reductions required by this section.

" '(b) The Department of Personnel Administration shall transmit proposed memoranda of understanding to the Legislature promptly and shall include with each such transmission estimated savings pursuant to this section of each agreement.

" '(c) Nothing in this section shall change or supersede the provisions of the Ralph C. Dills Act (Chapter 10.3 (commencing with Section 3512) of Division 4 of Title 1 of the Government Code).' " (*Professional Engineers, supra*, 50 Cal.4th 989, 1044.)

The Supreme Court identified three reasons why the phrase "existing administration authority" should be treated as referring to the existing two-day-per-month furlough program:

"First, the legislative history of the provision in question clearly and explicitly establishes that the reductions in appropriations for employee compensation that were included in the bill *reflected the two-day-a-month furloughs.* . . . This history makes it abundantly clear the Legislature

contemplated that the reduction in appropriations for employee compensation set forth in section 3.90 could be achieved through the furlough plan that was then in existence

"Second, aside from the furlough plan, the only other available 'existing administration authority' through which the state could have achieved the very substantial reduction in the appropriations for employee compensation mandated by the February 2009 budget legislation was the authority provided by section 19997, permitting a state appointing authority to 'lay off' state employees '[w]henever it is necessary because of *lack of . . . funds,* or whenever it is advisable in the interests of economy, to reduce the staff of any state agency . . . .' In our view it is not reasonable to suggest that the Legislature intended *to compel* the state, in the absence of a mutually agreed-upon collective bargaining resolution, to resort to *layoffs* of a significant percentage of state employees rather than to permit the state to utilize the furlough plan that was then already in use, particularly when the legislative history makes no reference to such layoffs.

"Third, although at the time the revised budget act was adopted on February 20, 2009, the trial court's judgment upholding the validity of the furlough program already had been appealed and the Legislature could not have known how the appeal ultimately would be resolved, it is reasonable to assume that body recognized that the reduction in employee compensation mandated by the revised 2008 Budget Act would have to be implemented prior to a final resolution of the appeal. We conclude that, in view of the exigent circumstances facing the Legislature, it intended to permit the then existing furlough program to be used as an alternative to other means that might be agreed upon through the collective bargaining process, without regard to whether the appellate courts ultimately determined that the Governor or the DPA possessed the authority to impose an unpaid furlough program unilaterally.

"Accordingly, we conclude that the phrase 'existing administration authority'—as used in section 36 of Senate Bill 3X 2—was intended to encompass the then existing furlough program. By enacting this provision, the Legislature, *through the exercise of its own legislative prerogative,* authorized the substantial reduction in the appropriations for employee compensation, mandated in the revised budget legislation, to be achieved through the two-day-a-month furlough plan." (*Professional Engineers, supra,* 50 Cal.4th 989, 1046–1048.)

On July 23, 2009, 22 days after Governor Schwarzenegger issued Executive Order No. S-13-09 expanding the furlough program to three days per month, the Legislature passed Assembly Bill No. 4X 1 (2009–2010 1st Ex.

Sess.), the revised Budget Act of 2009, which was signed by the Governor on July 28, 2009. The measure directs personnel cost reductions using the same language as contained in the revised Budget Act of 2008.[5] Specifically:

"SEC. 552. Section 3.90 of the Budget Act of 2009 is amended to read:

"Sec. 390. (a) Notwithstanding any other provision of this act, each item of appropriation in this act, with the exception of those items for the California State University, the University of California, Hastings College of the Law, the Bureau of State Audits, the Legislature (including the Legislative Counsel Bureau), and the judicial branch, shall be reduced, as appropriate, to reflect a reduction in employee compensation achieved through the collective bargaining process for represented employees or through existing administration authority and a proportionate reduction for nonrepresented employees (utilizing existing authority of the administration to adjust compensation for nonrepresented employees) in the total amounts of $1,477,917,000 from General Fund items and $973,058,000 from items relating to other funds. The Director of Finance shall allocate the necessary reductions to each item of appropriation to accomplish the employee compensation reductions required by this section.

"(b) The Department of Personnel Administration shall transmit proposed memoranda of understanding to the Legislature promptly and shall include with each such transmission estimated savings pursuant to this section of each agreement.

"(c) Nothing in this section shall change or supersede the provisions of the Ralph C. Dills Act (Chapter 10.3 (commencing with Section 3512) of Division 4 of Title 1 of the Government Code)." (Stats. 2009, 4th Ex. Sess. 2009–2010, ch. 1, § 552.)

■ Our analysis of *Professional Engineers* leads us to conclude that the third day of the furlough program imposed by the Governor's second Executive Order was ratified by the Legislature when it revised the 2009 Budget Act. *Professional Engineers* made it clear that it is the Legislature, not the Governor, which has the preeminent role—and the final say—in fixing the compensation paid to represented state employees, with that final say often being expressed in the budget process.[6] (*Professional Engineers, supra,*

---

[5] Actually, the Legislature passed two revisions of the 2008 Budget Act (Stats. 2008, ch. 269; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 2), but only the first is germane here. Any reference hereafter to revisions to the Budget Act of 2008 are to Statutes 2008, chapter 269.

[6] Apart from the budget, the other major way in which the Legislature involves itself in fixing state employees' salaries is with the Ralph C. Dills Act (§ 3512 et seq.). Under the provisions of that measure, it is the Governor who negotiates with represented state employees

50 Cal.4th 989, 1024 ["the Legislature has demonstrated a special interest in retaining (through the budget process or otherwise) ultimate control over the salary and wages of such employees"], 1043 ["the Legislature retained its ultimate control (through the budget process) over expenditure of state funds required by the provisions of an MOU"]; see also *id.* at pp. 1019–1020, 1038, fn. 34.)

The *Professional Engineers* court explained that by enacting revisions to the 2008 Budget Act, the Legislature exercised its ultimate authority over compensation of state employees: "[W]hen the Legislature enacted, and the Governor then signed, legislation revising the 2008 Budget Act, the validity of the mandatory furlough program fundamentally changed. The new legislation explicitly reduced the 2008–2009 fiscal year appropriation for state employee compensation to a level reflecting the reduced compensation to be paid to employees under the Governor's furlough plan." (*Professional Engineers, supra,* 50 Cal.4th 989, 1043.)

*Professional Engineers* considered only the two furlough days implemented by reason of Executive Order No. S-16-08 and validated by the Legislature's subsequent ratification as evidenced by language in the revised 2008 Budget Act. The validity of the third furlough day mandated by Executive Order No. S-13-09 was not addressed. (*Professional Engineers, supra,* 50 Cal.4th 989, 1003, 1007.) But the Legislature's subsequent revision of the 2009 Budget Act used virtually identical language, and, by parity of reasoning, should thus be viewed as the Legislature's ratification of the third furlough day mandated by Executive Order No. S-13-09.

Neither the Governor nor SEIU appears to seriously contest that the validity of the three-day-per-month furlough program is established by the revised 2009 Budget Act, viewed through the lens of *Professional Engineers*; indeed, SEIU does not even mention the revised 2009 Budget Act in its supplemental brief. Beyond this generality, however, the parties have fiercely opposed views of the permissible scope of the program.

---

for a new labor contract, technically termed a memorandum of understanding (MOU), which is then "presented, when appropriate, to the Legislature for determination." (§§ 3517, 3517.5.) The circumstances are "appropriate" "If any provision of the memorandum of understanding requires the expenditure of funds, those provisions of the memorandum of understanding may not become effective unless approved by the Legislature in the annual Budget Act" or other if "legislative action to permit its implementation" is required. (§§ 3517.6, subd. (b), 3517.61; see *Professional Engineers, supra,* 50 Cal.4th 989, 1039–1040.) The Supreme Court had previously held that even if the Legislature has approved an MOU covering a number of years, the Legislature has no obligation to appropriate sufficient monies to fully fund employee salaries under the MOU (*White v. Davis* (2003) 30 Cal.4th 528, 572–573 [133 Cal.Rptr.2d 648, 68 P.3d 74]), a point the court obliquely mentioned in *Professional Engineers.* (*Professional Engineers, supra,* at p. 1043.)

### All but Five of the Defendants Were Legislatively Included in the Expanded Furlough Program

As previously indicated, the Governor submits that *"Professional Engineers* fully disposes of the issues in this case," intimating our only function is tantamount to a ministerial duty to reverse the trial court's judgment. Hoping to keep all of the named agencies within the furlough program, the Governor points to the language in both Executive Orders that the furlough program be applied to all state agencies "regardless of funding source." The court in *Professional Engineers* repeatedly referred to the ambit and operation of the program as "across the board" in reducing wages and salaries (*Professional Engineers, supra,* 50 Cal.4th 989, 1025, 1030, 1035, 1037), and spoke of the Legislature's revision of the 2008 Budget Act in connection with "the furlough program that was then in existence." (50 Cal.4th at pp. 1000, 1047; see also, *id.,* at pp. 1046, 1047 ["then existing furlough plan"].) Thus, the Governor sees *Professional Engineers* as the Supreme Court's upholding legislative approval for the entirety of the expanded furlough program, leaving no room for distinctions based on funding sources.

SEIU accepts that *Professional Engineers* covers state employees who are paid out of the General Fund for two days of furlough pursuant to the Governor's first Executive Order. But SEIU insists that the authority of *Professional Engineers* ends there, and cannot reach three groups of state employees: (1) those who work for agencies or departments that are not funded by "an item of appropriation" in the Budget Act, which would mean agencies or departments that are financed from other sources, primarily dedicated or "special funds"; (2) those in agencies using special funds that are statutorily protected from having resources borrowed by the General Fund, the so-called "non-borrowable" funds; and (3) those in units of state government that are financed entirely by the federal government. As SEIU observes, there is no mention in *Professional Engineers* of "special funds," "borrowable funds," or federal funds that pay for operations of state government.[7] By virtue of these silences, SEIU asserts, the opinion actually "supports granting SEIU's petition for writ of mandate" as to the three categories of state employees SEIU has identified, because imposing furloughs on them results in no reduction in state expenditures, the ostensible justification for the furloughs—an argument that would require us to explore

---

[7] The topography of the state's budgetary terrain is territory seldom traversed by courts. A highly useful primer is in a declaration by a senior member of the Department of Finance responsible for "statewide budget planning and preparation, cash management, . . . and other . . . issues pertaining to the budget." This official describes some of the basic materials of the state budget as follows:

"For budgetary . . . purposes, the funds of the state are divided into two main groups, Governmental Cost Funds and Nongovernmental Cost Funds. Governmental Cost Funds

every nook and cranny of this unfamiliar landscape, searching for special
funds, and then checking the codes to ascertain whether they may be

consist of those funds that receive revenues derived from taxes, licenses, and fees. Expenditures of these Governmental Cost Funds represent the cost of operating the State government. There are two major fund types which comprise the Governmental Cost Funds. These two major fund types are the General Fund and Special Funds.

"The General Fund is the main operating fund of the State, consisting of moneys that are not required by law to be deposited into any other fund. Cash of the General Fund is maintained in the Pooled Money Investment Account (PMIA).

"Special Funds are used to account for resources that are legally restricted for particular functions or activities of government. With certain exceptions, these funds are mostly 'borrowable' by the General Fund for daily cash flow purposes. (Certain Nongovernmental Cost Funds are also borrowable by the General Fund for this purpose.) The following are classified as special funds:

"General Fund Special Accounts are accounts within the General Fund created by the Legislature to account for revenues that are restricted by law for specific purposes. These accounts are treated as special funds and are excluded from the General Fund for accounting and budgetary purposes.

"Feeder Funds are the depositories for the collection of major taxes prior to clearance to the General Fund.

"Transportation Funds are used to account for revenues that are restricted by law to transportation and related public safety programs.

"Other Governmental Cost Funds are used to account for other revenues that are restricted by law for specific purposes.

"Whenever cash in the General Fund is or will be exhausted, it is common practice for the State to borrow from internal state funds (borrowable resources) and from the external financial markets to fully meet its constitutional and statutory fiscal obligations. . . .

"According to the [State Controller's] latest information, there are over 700 funds/accounts that are internal borrowable resources for the General Fund. These funds/accounts deposit their idle cash in the PMIA and the cash in the overall PMIA is invested by the State Treasurer's Office . . . . [The State Controller] evaluates the General Fund cash needs and determines how much to borrow from the borrowable resources that reside in the PMIA. With certain exceptions, this borrowing is actually made from the PMIA overall cash balance and not from individual funds/accounts."

But even this list is incomplete. It does not take account of the peculiar feature known as the continuing appropriation, that is, an appropriation that " 'runs from year to year without the need for further authorization in the budget act.' " (*White v. Davis, supra,* 30 Cal.4th 528, 538, italics omitted.) Because a continuing appropriation is essentially "a self-executing authorization to disburse funds" for a specific purpose independent of the Budget Act (*White v. Davis* (2002) 108 Cal.App.4th 197, 210, 223 [133 Cal.Rptr.2d 691]; see *Daugherty v. Riley* (1934) 1 Cal.2d 298, 308 [34 P.2d 1005]; 64 Ops.Cal.Atty.Gen. 809, 810–813 (1981)), it may not necessarily generate an "item of appropriation." (See Stats. 2008, ch. 268, § 3:00; Stats. 1983, ch. 323, § 151.4, p. 1099.)

In other words, a continuing appropriation is part of the budgetary process even if it goes unmentioned in the Budget Act. "Continuous appropriation status in no way removes the revenue or expenditures . . . from annual adjustment in the Budget Act." (Stats. 1983, ch. 323, § 151.4, p. 1100.) Even more confusingly, continuing appropriations are often attached to what appear to be special funds. (E.g., § 75600 [establishing "a trust fund known as the Judges' Retirement System II Fund"]; Sts. & Hy. Code, § 188.62 ["there is hereby continuously appropriated to the [Department of Transportation] for expenditure all amounts paid to the department by the Bay Area Toll Authority"].) Some continuing appropriations go through the General Fund. (E.g., Ed. Code, § 22955, subd. (a) ["a continuous appropriation is hereby

borrowed. This, we need not do, because such specialized knowledge is not necessary to decide the matter.

It is true that the court in *Professional Engineers* repeatedly used the language quoted by the Governor. But the Governor's view that the Legislature and the Supreme Court have made a blanket endorsement of the furlough program as implemented is contrary to the plain words of the revisions to both budget acts.

■ The relevant language of both revised versions of section 3.90, subdivision (a) provides that "each item of appropriation in this act . . . shall be reduced . . . to reflect a reduction in employee compensation achieved through . . . existing administration authority . . . ." It is clear that the phrase "existing administration authority"—which *Professional Engineers* treated as a near-synonym for the two-day-per-month furlough program—is subordinate to, and dependent on, the words "each item of appropriation." If there is no "item of appropriation," there is no predicate for "existing administration authority" to operate because, as the *Professional Engineers* court put it, there is no legislative "mandate" for the executive branch to reduce expenditures by furloughing employees. (*Professional Engineers, supra,* 50 Cal.4th 989, pp. 1000, 1044, 1046, 1047–1048, 1052.) Only this interpretation can explain the command in the final sentence that "The Director of Finance shall allocate the necessary reduction to each item of appropriation to accomplish the employee compensation reductions required by this section." (§ 3.90, subd. (a).)

In his opening brief, the Governor represented that of the more than 60 state defendants, only 30 "receive a portion of their budgets from the General Fund." Given the importance of the issues, we followed President Reagan's famous maxim to "Trust, but verify," and examined the budget acts themselves. They establish that of the 63 named defendants, all but five have at least one "item of appropriation" in each of the budget acts. For the readers who also prefer to "Trust, but verify," the particulars are set out as an appendix to this opinion.

SEIU was expressly asked at oral argument whether, if a state agency is the subject of an item of appropriation in the 2008 and 2009 Budget Acts, that

---

annually made from the General Fund . . . for transfer to the Teachers' Retirement Fund"]; Pub. Resources Code, § 14312 ["The Collins-Dugan California Conservation Corps Reimbursement Account is hereby created in the General Fund" and "money in the . . . Account is hereby continuously appropriated to the corps"].) Others seemingly do not. (E.g., Food & Agr. Code, § 62571 ["any money which is collected" by the Director of the Dept. of Food and Agriculture for the Milk Producers Security Trust Fund "is hereby continuously appropriated to the director"].) The monies going to the General Fund would appear to qualify as what the Department of Finance official identified as "General Fund Special Accounts."

agency's inclusion in the furlough program was governed by *Professional Engineers*. SEIU replied that the existence of an item of appropriation for a named defendant agency was merely "the first requirement," while "the second requirement goes to the issue of borrowability."[8] If SEIU is arguing that, in addition to an item of appropriation, an agency can only be validly included in the furlough program if that agency has a special fund and the Legislature actually borrowed money from that fund, we cannot agree.

■ We have examined the question of "borrowability" with considerable attention because it has been a central theme of SEIU's litigation strategy before and after *Professional Engineers*. Whether money in a given special fund was actually borrowed by the Controller pursuant to section 16310, or was merely theoretically "borrowable," is immaterial in the face of the incontestable proof of "items of appropriation" covering the great majority of the state officers and agencies named in SEIU's amended petition. Nothing in *Professional Engineers* hints that the indisputable existence of an "item of appropriation" may be ignored or otherwise undermined because all or a portion of that appropriation represents a borrowed loan from a special fund. Indeed, the concept of "borrowability" was never mentioned by the Supreme Court. Thus, the Legislature's long-standing practice of borrowing special funds (see fn. 8, *ante*) has no significance in transmuting an "item of appropriation" into something else. It has long been held that the entirety of monies allocated by the Legislature to fund the operations of a unit of state government is likewise deemed a single "item of appropriation." (See

---

[8] It is a long-standing practice for special funds to be involuntarily borrowed by the General Fund. (See *Daugherty v. Riley, supra*, 1 Cal.2d 298, 308–309.) Section 16310 codifies this practice, and many statutes expressly allow for it. (See, e.g., Ed. Code, § 89722; Fam. Code, § 17311; Fish & G. Code, § 13001; Health & Saf. Code, § 50199.9; Pub. Resources Code, § 8613; Rev. & Tax. Code, § 7102.) By contrast, it is rare to find a statute prohibiting borrowing by the General Fund. (See, e.g., § 99009 ["Moneys held in the Fiscal Recovery Fund may not be borrowed by, or available for transfer to, the General Fund pursuant to Section 16310 or any similar authority . . . ."]; Health & Saf. Code, § 51625 ["Moneys in the [California Housing Loan Insurance Fund] shall not be subject to transfer to any other fund pursuant to Part 2 (commencing with Section 16300) . . . of the Government Code, except the Surplus Money Investment Fund."]; Mil. & Vet. Code, § 988.6 subd. (c) ["Moneys in the Veterans' Bonds Payment Fund shall be used solely as described in subdivision (a), and therefore no moneys in that fund shall be borrowed by, or transferred to, the General Fund pursuant to subdivision (a) of Section 16310 . . . ."]; cf. Cal. Const., art. XIX A, § 1, subd. (b) ["Funds in the Public Transportation Account may not be loaned or otherwise transferred to the General Fund . . . ."].) There are literally dozens of "items" in the 2008 and 2009 Budget Acts that specify the amount of "borrowings" from special funds. (See *California Medical Assn. v. Brown* (2011) 193 Cal.App.4th 1449 [123 Cal.Rptr.3d 647] for a discussion of one such borrowing.) As a ready source of cash, these borrowings have become an integral component of the budgetary calculus, apparently so much so that in 2009 the Legislature enacted two urgency measures that increased the number of special funds that would henceforth be available for borrowing. (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 9, eff. Feb. 20, 2009; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 23, eff. July 28, 2009.)

*Metropolitan Water Dist. v. Marquardt* (1963) 59 Cal.2d 159, 174 [28 Cal.Rptr. 724, 379 P.2d 28], citing *Veterans' Welfare Board v. Jordan* (1922) 189 Cal. 124 [208 P. 284]; *Reardon v. Riley* (1938) 10 Cal.2d 531, 536 [76 P.2d 101], citing *Riley v. Johnson* (1933) 219 Cal. 513 [27 P.2d 760]; *California Teachers Assn. v. Cory* (1984) 155 Cal.App.3d 494, 513–514 [202 Cal.Rptr. 611].) SEIU advances no compelling reason why this line of authority is inapplicable here.

Thus, under *Professional Engineers*, the existence of one or more items of appropriation for any of the named defendant agencies is conclusive. Despite much argument, SEIU is unable to identify a single statutorily designated "non-borrowable" specific fund (see fn. 8, *ante*) from which the Legislature purported to transfer amounts in order to balance either of the budgets.[9] Such an identification would in any event be ineffective at neutralizing the existence of an express item of appropriation. And the same would logically hold true for the asserted existence of any agency employing staff who are paid with federal funds.[10]

As previously mentioned, our independent research disclosed that 58 of the 63 defendant state entities named in SEIU's amended petition are the subject of at least one item of appropriation in the 2008 and the 2009 Budget Acts. Therefore, as to those entities the Legislature has mandated and ratified the inclusion of their employees in the furlough program. It follows that the judgment against them must be reversed.

---

[9] On the assumption that the Legislature had in fact made such transfers, SEIU extrapolated that they would effect a repeal by implication of statutes prohibiting involuntary borrowing by the state. This argument was doomed because, despite a direct inquiry from this court, SEIU was unable to identify a single "non-borrowable" special fund that was compelled to loan money by operation of section 16310.

[10] In fact, SEIU purports to identify only one state agency in the third category. According to SEIU, the "California Disability Determination Services Division" should be exempt from the furlough program because it administers federal Social Security programs, and is recompensed by the Social Security Administration. SEIU is apparently referring to functions performed by the State Department of Social Services (see Welf. & Inst. Code, §§ 10553, subds. (d), (e), 10600.1), although we have been unable to confirm that these functions are performed by an actual division of that department. We found no mention of such an entity in either the annotated codes or the California Code of Regulations. Still, it is mentioned on the State Department of Social Services's Web site. (<http://www.dss.cahwnet.gov/cdssweb/PG190.htm> [as of July 8, 2011].) In any event, because the State Department of Social Services is the subject of items of appropriation in the 2008 and 2009 Budget Acts, we would be forced to conclude that entire department is subject to the furlough program notwithstanding that part of its operating expenses may in fact ultimately be paid by the federal government. (See *Metropolitan Water Dist. v. Marquardt, supra,* 59 Cal.2d 159, 174; *California Teachers Assn. v. Cory, supra,* 155 Cal.App.3d 494, 513.)

## The Five

The five agencies named by SEIU in its amended petition that are not the subject of an item of appropriation in either of the budget acts are (1) the California Children and Families Commission (also known as First 5 California, the designation used by SEIU in its complaint); (2) the Prison Industry Authority; (3) the California Earthquake Authority; (4) the California Housing Finance Agency; and (5) the Office of Administrative Hearings. SEIU argues that these agencies are exempt from the furlough program because they do not rely on appropriations from the General Fund for their operation. More precisely, because these agencies receive *no* money from the General Fund, SEIU treats them as funded exclusively by special funds, and therefore per se outside the permissible scope of the furlough program.

These five agencies are not your standard bureaucracies. Their purposes, structures, and origin of operating moneys are so dissimilar as to preclude a group classification.[11] For present purposes, their only commonality is that none has an item of appropriation in either of the budget acts. There is no need to determine whether these agencies' special funds—assuming they

---

[11] The California Children and Families Commission, also known as First 5 California (Health & Saf. Code, § 130110, subd. (a)), was established by the voters' enactment of Proposition 10 in November 1998. (See Historical and Statutory Notes, 41H West's Ann. Health & Saf. Code (2006 ed.) foll. § 130100, p. 773.) The commission is not located in a larger agency, but is a stand-alone entity administering the California Children and Families Trust Fund, which is funded by taxes on tobacco products. (*Id.*, § 130105, subds. (a), (b), (c).) Acting in concert with county commissions, the state commission is dedicated to "the promotion, support, and improvement of early childhood development." (*Id.*, § 130125, subd. (a); see *id.*, § 130140.) The trust fund "is . . . for the exclusive purpose of funding . . . the California Children and Families Act," and, except for specified disbursements related to tax collection, all moneys in the trust fund "are continuously appropriated for the exclusive purpose of the California Children and Families Program," and "shall [not] be used to supplant state . . . General Fund money for any purpose." (Rev. & Tax. Code, §§ 30131, 30131.3, 30131.4.) The moneys in the trust fund are to be dispersed to various accounts according to a statutory formula. (Health & Saf. Code, § 130105, subd. (d).) One of those accounts funds the state commission's administration. The details of administration, such as staffing and salaries, are pretty much entirely within the state commission's discretion. (*Id.*, §§ 130105, subd. (d)(1)(E), 130120.) As previously mentioned, there is no mention of the California Children and Families Commission in either of the budget acts, but there are transfers from the trust fund to the Board of Equalization which are for reasons permitted by the children and staff. (Stats. 2008, ch. 268, § 2.00 [item 0860-001-0623]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 0860-001-0623].)

The Prison Industry Authority is a part of the Department of Corrections and Rehabilitation, and is "authorized and empowered to operate industrial, agricultural, and service enterprises which will provide products and services needed by the state . . . for any . . . public use." (Pen. Code, §§ 2800, 2807, subd. (a).) A permanent Prison Industries Revolving Fund of not less than $730,000 exists "to meet the expenses necessary in the purchasing of materials and equipment, salaries, construction and cost of administration of the prison industries program." (*Id.*, § 2806.)

have such—are borrowable because the parties have not presented any reason to believe, nor is there any indication in either of the budget acts, that such funds were in fact borrowed pursuant to section 16310.

■ Because the five agencies are not tied to an item of appropriation in the budget acts, their inclusion in the furlough program is not "mandated" by an act of the Legislature, and thus, strictly speaking, are outside the holding of *Professional Engineers*. (See *Professional Engineers, supra,* 50 Cal.4th 989, 1000.) Nevertheless, we do not categorically exclude the possibility that the five agencies may be brought within the furlough program for reasons not disclosed by the made-obsolete-by-subsequent-events record before us. We must allow for the possibility that not every answer can be found in the 763 pages (including the Governor's line item reductions) of the 2008 Budget Act (Stats. 2008, ch. 268), the 666 pages of the 2009 Budget Act (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1), or the 639 pages of revisions. (Stats. 2008, ch. 269; Stats. 2009, 4th Ex. Sess. 2009–2010, ch. 1.)

For example, there is the distinct situation of the continuing appropriation, which, as previously mentioned, may or may not appear in the Budget Act.

---

The California Earthquake Authority is essentially a state-sponsored insurance pool of residential property insurers that issues policies of earthquake insurance to California residential property owners. (Ins. Code, § 10089.26.) It is authorized to purchase reinsurance and to issue bonds. (*Id.,* §§ 10089.9, 10089.29.) The authority's "costs . . . operating and other expenses" are to be paid out of the California Earthquake Authority Fund, which is itself funded by a continuing appropriation. (*Id.,* § 10089.22, subd. (b).)

The California Housing Finance Agency is located in the Business, Transportation and Housing Agency (Health & Saf. Code, § 50900), and is intended to "meet the housing needs of persons and families of low or moderate income" by facilitating the growth of housing stock. (*Id.,* §§ 50950, 50959, 50961.) As summarized by our Supreme Court: "In furtherance of this purpose, the Agency is authorized to issue revenue bonds . . . . Proceeds of the bonds are to be made available to 'housing sponsors' (described . . . as various types of private developers and local public entities) in the form of development loans, construction loans, mortgage loans (for new construction and rehabilitation) and advances in anticipation of such loans, to construct, develop and acquire housing developments [citations]. In addition, bond proceeds . . . may be used either to purchase loans from qualified mortgage lenders [citations] or to lend funds to qualified mortgage lenders on the condition that they make such loans [citations]." (*California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 580 [131 Cal.Rptr. 361, 551 P.2d 1193].) The California Housing Finance Agency is meant to be fiscally self-sufficient. (Health & Saf. Code, § 50956.) The agency administers the Home Purchase Assistance Fund, which is funded by a continuing appropriation. (See *id.,* § 51344.)

The Office of Administrative Hearings is in the Department of General Services. (§ 11370.2.) It provides the administrative law judges who preside over the numerous kinds of hearings governed by the Administrative Procedure Act (§ 11370 et seq.), or as otherwise required. (§ 11370.3.) It apparently has no annual budget and is hardly the master of its own financial affairs. Operating costs, including overhead, are billed and collected on a piecemeal basis: "The total cost to the state of maintaining and operating the Office of Administrative Hearings shall be determined by, and collected by the Department of General Services in advance or upon such other basis as it may determine from the state or other public agencies for which services are provided by the office." (§ 11370.4.)

(See fn. 7, *ante*.) It has already been established that the California Earthquake Authority is maintained by a continuing appropriation. (See Ins. Code, § 10089.22, subd. (b), quoted in fn. 11.) It is conceivable that the Prison Industry Authority may require legislative augmentation of the moneys on hand so as to keep the Prison Industries Revolving Fund at the statutorily mandated minimum of $730,000. (See Pen. Code, § 2806, cited in fn. 11.) We must also recognize that once the parties have focused their attention—for the first time—on the issue of the continuing appropriation, they may be able to formulate arguments as to whether such an event was within the logic of *Professional Engineers* even if did not qualify as an "item of appropriation."[12] Another possibility is that a continuing appropriation is connected to a special fund that was recently made available for borrowing. (See fns. 7, 8.) Yet another is that the personnel administering the Prison Industry Authority are within the logic of *Professional Engineers* even if not the subject of an express item of appropriation because, as employees in the Department of Corrections and Rehabilitation, they are covered by one of more items of appropriation for that department in the budget acts. Counsel for the Governor suggested at oral argument that the same might be true for the Office of Administrative Hearings.

These are merely some of the possibilities dealing with matters that were never addressed in the trial court and thus cannot be verified from the record on appeal. We have already conceded that knowledge of the state budget process is not an ordinary judicial qualification. Because these are matters that cannot be resolved solely by reading the budget acts, we conclude it is appropriate to provide the parties with an opportunity to introduce evidence more directly pertinent to the issues as reframed by *Professional Engineers*. This can be done on the remand we order.

### Issues of Public Policy We Do Not Consider

The Governor makes a compelling case that the state's budgetary problems were so deep and dire that innovative and comprehensive measures were

---

[12] The role of the continuing appropriation may be especially significant because it appears to be one mechanism the Legislature has selected to help prevent a recurrence of this type of litigation. During the pendency of this appeal, the Legislature enacted a number of bills providing that if a specified bargaining unit has a memorandum of understanding with the state, and if the budget is not passed by a specified date, then "there [will be] continuously appropriated to the Controller from the General Fund, unallocated special funds, including, but not limited to, federal funds and unallocated nongovernmental cost funds, and any other fund from which state employees are compensated, the amount necessary for the payment of compensation and employee benefits to state employees covered by the above memoranda of understanding until the . . . Budget Act is enacted." (§§ 19829.7, subd. (a), 19829.8, subd. (a), 19829.9, subd. (a), 19829.95, subd. (a), 19829.96, subd. (a), 19829.97, subd. (a), 19829.98, subd. (a); see Stats. 2010, ch. 162, §§ 6–9; Stats. 2010, ch. 163, §§ 6–9; Stats. 2010, ch. 728, §§ 5–7.)

required to halt the financial hemorrhaging. SEIU does not deny the need for action, but argues that the ostensible goal is not advanced by a procrustean program that furloughs employees in agencies that are in effect making a profit for the state.

As an abstract matter, there may be much to commend the Governor's conception of a furlough program with the widest application consistent with public safety. On the other hand, there might be some force to SEIU's claim that it is economically pointless to try to reduce a massive budgetary shortfall by cutting back on the operations of agencies—for example, it claims, the Franchise Tax Board—that generate more revenues than their costs. These are weighty considerations, but it is not our job to resolve them.

■ This court is on record as recognizing the profound judicial reluctance to second-guess policy decisions made by the political branches. We recently stated that "In reviewing statutes enacted by the Legislature, courts ' "may not undertake to evaluate the wisdom of the policies embodied in such legislation; absent a constitutional prohibition, the choice among competing policy considerations in enacting laws is a legislative function." ' " (*Coastside Fishing Club v. California Resources Agency* (2008) 158 Cal.App.4th 1183, 1203 [71 Cal.Rptr.3d 87]; see *Rittenband v. Cory* (1984) 159 Cal.App.3d 410, 432 [205 Cal.Rptr. 576] ["resolution of competing goals is precisely the sort that is best left to the legislative process"].) This is particularly true when the competing considerations are economic (e.g., *California Medical Assn. v. Brown, supra*, 193 Cal.App.4th 1449, 1464; *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 218 [27 Cal.Rptr.2d 396]), and most true concerning the budget because "the Legislature is the branch of government that must, on a yearly basis, fit the needs of the state into the funds available." (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 302 [105 Cal.Rptr.2d 636, 20 P.3d 533]; see *County of Butte v. Superior Court* (1985) 176 Cal.App.3d 693, 698 [222 Cal.Rptr. 429] [the "integrated process of determining the budget . . . is a legislative function which 'may not be controlled by the courts.' "].) We have also stated that "[t]he fact that a statute may be harsh, unfair, inequitable or create hardships does not show that the Legislature did not mean what it said. The courts are not concerned with the expediency, wisdom or utility of legislative enactments so long as constitutional principles are not violated." (*San Diego County Water Authority v. Metropolitan Water Dist.* (2004) 117 Cal.App.4th 13, 28 [11 Cal.Rptr.3d 446].)

No constitutional issue is presented against the legality of the furlough program. SEIU spends a good deal of its attention to the asserted illogic of a furlough program that may not result in saving money and may actually cost the state more than it saves. That may be true. But the furlough program can

be seen as serving other goals. The most obvious is to avoid adding state employees to the burgeoning number of the unemployed. (See *Professional Engineers, supra*, 50 Cal.4th 989, 1047.) Reducing the state's immediate labor costs helps stanch the flow of red ink, both in the obvious and immediate sense, and also for a reason found only in the shadowy realm of budget logic. As explained by the Department of Finance official: "The furloughing of employees paid out of the General Fund provides immediate . . . budgetary and cash savings. Although furloughing non-General Fund employees did not directly contribute to closing the General Fund budget gap, it did/does provide relief to the General Fund cash shortage since this increased the cash balances in internal borrowable resources. Furloughing employees in non-General Fund activities/programs/departments reduced spending from those borrowable funds as a result of the reduction in hours worked and thus increased borrowable fund cash balances for the General Fund. In projecting the impact of furloughing borrowable fund employees, it was estimated by the end of the 17-month furlough period, approximately $690 million would be added to the balances of these internal borrowable resources." This course of action was the unanimous recommendation of the Controller, the Treasurer, and the Legislative Analyst, who preferred it to the most costly alternative of "borrowing from the external market."[13]

Giving the program the broadest scope consistent with public safety may implicate considerations more intangible but no less consequential. It is clearly in the interests of harmonious operations that a spirit of shared sacrifice be widespread, avoiding invidious comparisons of paychecks between employees who work together or perform equivalent functions. In addition, given what appears to be the fact that certain agencies have multiple sources of funding, it might be administratively difficult for the Controller to determine which employees are subject to the furlough program.

The dollars and cents consequences—if such there be—are not established by the record on appeal. Savings effected by the furlough program might not necessarily be confined simply to reductions in employee salaries, as SEIU posits. Furloughing all employees might allow a building to be closed, thereby saving money not spent for lighting, heating, security, etc. In addition, on the assumption that the staff of the five agencies qualify as public employees, there may be pension-related costs of which we are unaware. There may be additional factors. We just do not know.

█ The controversy generated by the furlough program demonstrates that reasonable minds may disagree about the weight of these concerns. The

---

[13] As previously mentioned, the Legislature also did its part by enacting measures that effectively reclassified several dozen special funds as "borrowable" for the General Fund in accordance with section 16310. (See fn. 8, *ante*.)

furlough program may have a less than perfect application, be unable to satisfy the demands of platonic perfection, or may result in less than optimal departmental efficiency. But these are, at bottom, competing theories about how the state should spend its money. The results may be uneven, perhaps even unfair, but that does not condemn them as—to use the trial court's characterizations—"arbitrary, capricious, and unlawful." The wisdom and expediency of the choices made by the political branches are not subject to judicial recalibration. (*Coastside Fishing Club v. California Resources Agency,* *supra,* 158 Cal.App.4th 1183, 1203; *San Diego County Water Authority v. Metropolitan Water Dist., supra,* 117 Cal.App.4th 13, 28.)

The foregoing establishes that neither of the two specified grounds for the judgment is sound. The first, based on the trial court's interpretation of section 19851, was rejected in *Professional Engineers.* (See fn. 2, *ante.*) The second, based on section 16310, is ineffective because it assumes a causal connection between borrowings from special funds and the furlough program that is no longer tenable after *Professional Engineers.*[14] (See fn. 3.)

The preceding analysis is based on matters and arguments that became relevant only after the trial court had entered its judgment. The filing of *Professional Engineers* shifted attention from the Government Code to the budget acts. A whole new nomenclature was introduced. And, although applying *Professional Engineers* we have been able to determine, as a matter of law, that almost all of the state agencies named as parties by SEIU are properly included in the expanded furlough program, there may be issues that cannot be answered by this court's independent research. We are sensitive to what Justice Holmes said more than a century ago: "Considerable latitude must be allowed for . . . possible peculiar conditions which this court can know but imperfectly, if at all." (*Otis v. Parker* (1903) 187 U.S. 606, 608–609 [47 L.Ed. 323, 23 S.Ct. 168].) We therefore deem it appropriate to provide counsel and the trial court an opportunity to explore whether any of the five remaining agencies were properly included within the three-day-per-month furlough program.[15]

---

[14] In light of these conclusions, there is no need to address the Governor's contentions that the trial court erred "in expanding the relief granted to all employees . . . at the state agencies and departments named in this action," and in awarding backpay.

[15] SEIU filed a petition for rehearing, the sole purpose of which is to assert that there should be six, not five, agencies covered by our remand, because one of the 58 agencies was misidentified as having an item of appropriation in the 2008 and 2009 Budget Acts. SEIU asserts that even though the state lottery is mentioned in the budget acts, does have an item number, and is listed opposite a specific sum, its inclusion is nothing more than an "informational reference"—and thus not a true appropriation.

It is true that the California State Lottery Act of 1984 (§ 8880 et seq.) has a provision directing there shall be "No appropriation . . . of State funds . . . to the California State Lottery Commission." (§ 8880.3.) On the other hand, the lottery's operations are funded by annual continuing appropriations (§§ 8880.5 ["State Lottery Education Fund"], 8880.61 ["State Lottery Fund"]), which, as already noted, are not necessarily outside the budgetary process. (See fn. 7,

## DISPOSITION

The purported appeals from the order overruling the demurrer and the two orders after hearing are dismissed. The judgment is reversed and the cause is remanded to the trial court with directions to (1) recall the writ of mandate, (2) set aside the judgment granting the petition, and (3) conduct further proceedings as appropriate and enter a new judgment in conformity with this opinion. The parties shall bear their respective costs of appeal.

Kline, P. J., and Lambden, J., concurred.

A petition for a rehearing was denied August 4, 2011, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied September 21, 2011, S195654. Werdegar, J., did not participate therein.

---

*ante*.) The State Lottery Fund was one of the special funds the Legislature recently made available for borrowing by the General Fund (see fn. 8, *ante*), and it does not have the absolute statutory isolation from the budgetary process enjoyed by the State Compensation Insurance Fund, an entity which is completely unmentioned in the budget acts. (See *California Attorneys, etc. v. Brown* (2011) 195 Cal.App.4th 119, 123, fn. 5, 124 [125 Cal.Rptr.3d 463], and authorities cited.)

There are many continuing appropriations that are not mentioned in the budget acts, e.g., those to the Bay Area Toll Authority and the Milk Producers Security Trust Fund noted in footnote 7, *ante*. But the State Lottery Fund *is* mentioned and is connected to the running of the state lottery; and the amount in each budget act covers "payment of expenses of the lottery, including all costs incurred in the operation and administration of the lottery." Assuming that the figures mentioned in the budget acts are continuing appropriations, the very presence of those figures may reflect that they have been adjusted by the Legislature. If so, the amounts mentioned may qualify as items of appropriation. (See fn. 7, *ante*; see also *St. John's Well Child & Family Center v. Schwarzenegger* (2010) 50 Cal.4th 960, 975–976 [116 Cal.Rptr.3d 195, 239 P.3d 651] [collating definitions of "item of appropriation"].) As to these possibilities, the inadequacy of the record, and our limited knowledge of the budgetary process is manifest. Accordingly, on remand SEIU may try to demonstrate that the state lottery qualifies as a sixth state agency that should not be included in the furlough program.

## APPENDIX

The following are the officers and agencies named in SEIU's amended complaint. Beside each officer and agency are details of relevant items of appropriation in the 2008 and 2009 Budget Acts. We have elected not to mention every item of appropriation for a given officer or agency.

1. **Governor** (Stats. 2008, ch. 268, § 2.00 [item 0500-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 0500-001-0001].)

2. **Controller** (Stats. 2008, ch. 268, § 2.00 [item 0840-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 0840-001-0001].)

3. **Insurance Commissioner** (Stats. 2008, ch. 268, § 2.00 [item 0845-001-0217]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 0845-001-0217] for the Dept. of Insurance.)

4. **Attorney General** (Stats. 2008, ch. 268, § 2.00 [item 0820-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 0820-001-0001] for the Dept. of Justice.)

5. **Department of Personnel Administration** (Stats. 2008, ch. 268, § 2.00 [item 8380-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 8380-001-0001].)

6. **Department of General Services** (Stats. 2008, ch. 268, § 2.00 [item 1760-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 1760-001-0001].)

7. **California Transportation Commission** (Stats. 2008, ch. 268, § 2.00 [item 2600-001-0046]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 2600-001-0042].)

8. **Board of Pilot Commissioners** (Stats. 2008, ch. 268, § 2.00 [item 8530-001-0290]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 2670-001-0290].)

9. **Labor and Workforce Development Agency** (Stats. 2008, ch. 268, § 2.00 [item 0559-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 0559-001-0001].)

10. **California Conservation Corps** (Stats. 2008, ch. 268, § 2.00 [item 3340-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3340-001-0001].)

11. **Office of Planning and Research** (Stats. 2008, ch. 268, § 2.00 [item 0650-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 0650-001-0001].)

12. **Arts Council** (Stats. 2008, ch. 268, § 2.00 [item 8260-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 8260-001-0001].)

13. **Managed Risk Medical Insurance Board** (Stats. 2008, ch. 268, § 2.00 [item 4280-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 4280-001-0001].)

14. **Office of Real Estate Appraisers** (Stats. 2008, ch. 268, § 2.00 [item 2310-001-0400]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 2310-001-0400].)

15. **Department of Corporations** (Stats. 2008, ch. 268, § 2.00 [item 2180-001-0067]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 2180-001-0067].)

16. **Department of Managed Health Care** (Stats. 2008, ch. 268, § 2.00 [item 2400-001-0933]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 2400-001-0933].)

17. **Department of Real Estate** (Stats. 2008, ch. 268, § 2.00 [item 2320-001-0317]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 2320-001-0317].)

18. **Department of Consumer Affairs** (Stats. 2008, ch. 268, § 2.00 [item 1111-002-0702]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 1111-002-0702].)

19. **Department of Motor Vehicles** (Stats. 2008, ch. 268, § 2.00 [item 2740-001-0044]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 2740-001-0044].)

20. **Board of Administration of the Public Employees' Retirement System** (Stats. 2008, ch. 268, § 2.00 [items 1900-015-0822, 1900-015-0830]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [items 1900-001-0950, 1900-015-0830].)

21. **Santa Monica Mountains Conservancy** (Stats. 2008, ch. 268, § 2.00 [item 3810-001-0140]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3810-001-0140].)

22. **State Coastal Conservancy** (Stats. 2008, ch. 268, § 2.00 [item 3760-001-0565]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3760-001-0565].)

23. **California Victim Compensation and Government Claims Board** (Stats. 2008, ch. 268, § 2.00 [item 1870-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 1870-001-0001].)

24. **State Council on Developmental Disabilities** (Stats. 2008, ch. 268, § 2.00 [item 4100-001-0890]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 4100-001-0890].)

25. **Department of Pesticide Regulation** (Stats. 2008, ch. 268, § 2.00 [item 3930-001-0106]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3930-001-0106].)

26. **State Teachers' Retirement System** (Stats. 2008, ch. 268, § 2.00 [items 1920-002-0835, 1920-011-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [items 1920-001-0835, 1920-002-0835].)

27. **Department of Financial Institutions** (Stats. 2008, ch. 268, § 2.00 [item 2150-001-0298]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 2150-001-0298].)

28. **Department of Alcoholic Beverage Control** (Stats. 2008, ch. 268, § 2.00 [item 2100-001-3036]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 2100-001-3036].)

29. **Department of Boating and Waterways** (Stats. 2008, ch. 268, § 2.00 [item 3680-001-0516]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3680-001-0516].)

30. **California Gambling Control Commission** (Stats. 2008, ch. 268, § 2.00 [item 0855-001-0367]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 0855-001-0367].)

31. **Wildlife Conservation Board** (Stats. 2008, ch. 268, § 2.00 [item 3640-301-0262]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3640-301-0262].)

32. **Department of the California Highway Patrol** (Stats. 2008, ch. 268, § 2.00 [item 2720-001-0044]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 2720-001-0044].)

33. **California Horse Racing Board** (Stats. 2008, ch. 268, § 2.00 [item 8550-001-0191]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 8550-001-0191].)

34. **California State Lottery Commission** (Stats. 2008, ch. 268, § 2.00 [item 0850-001-0562]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 0850-001-0562].)

35. **Department of Community Services and Development** (Stats. 2008, ch. 268, § 2.00 [item 4700-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 4700-001-0890].)

36. **California Integrated Waste Management Board** (Stats. 2008, ch. 268, § 2.00 [item 3910-001-0100]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3910-001-0100].)

37. **Department of Industrial Relations** (Stats. 2008, ch. 268, § 2.00 [item 7350-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 7350-001-0001].)

38. **Department of Fish and Game** (Stats. 2008, ch. 268, § 2.00 [item 3600-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3600-001-0001].)

39. **Commission on Teacher Credentialing** (Stats. 2008, ch. 268, § 2.00 [item 6360-101-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 6360-001-0407].)

40. **Employment Development Department** (Stats. 2008, ch. 268, § 2.00 [item 7100-001-0870]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 7100-001-0870].)

41. **Department of Rehabilitation** (Stats. 2008, ch. 268, § 2.00 [item 5160-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 5160-001-0001].)

42. **State Air Resources Board** (Stats. 2008, ch. 268, § 2.00 [item 3900-001-0044]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3900-001-0044].)

43. **Department of Housing and Community Development** (Stats. 2008, ch. 268, § 2.00 [item 2240-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 2240-001-0001].)

44. **Employment Development Department** (Stats. 2008, ch. 268, § 2.00 [item 7100-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 7100-001-0001].)

45. **Department of Water Resources** (Stats. 2008, ch. 268, § 2.00 [item 3860-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3860-001-0001].)

46. **California Tahoe Conservancy** (Stats. 2008, ch. 268, § 2.00 [item 3125-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3125-001-0001].)

47. **Department of Conservation** (Stats. 2008, ch. 268, § 2.00 [item 3480-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3480-001-0001].)

48. **State Water Resources Control Board** (Stats. 2008, ch. 268, § 2.00 [item 3940-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3940-001-0001].)

49. **State Department of Health Care Services** (Stats. 2008, ch. 268, § 2.00 [item 4260-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 4260-001-0001].)

50. **Department of Public Health** (Stats. 2008, ch. 268, § 2.00 [item 4265-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 4265-001-0001].)

51. **State Department of Social Services** (Stats. 2008, ch. 268, § 2.00 [item 5180-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 5180-001-0001].)

52. **Department of Transportation** (Stats. 2008, ch. 268, § 2.00 [item 2660-001-0041]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 2660-001-0041].)

53. **Department of Toxic Substances Control** (Stats. 2008, ch. 268, § 2.00 [item 3960-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3960-001-0001].)

54. **Department of Industrial Relations** (Stats. 2008, ch. 268, § 2.00 [item 7350-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 7350-001-0001].)

55. **California Department of Aging** (Stats. 2008, ch. 268, § 2.00 [item 4170-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 4170-001-0001].)

56. **Department of Parks and Recreation** (Stats. 2008, ch. 268, § 2.00 [item 3790-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 3790-001-0001].)

57. **Business, Transportation and Housing Agency** (Stats. 2008, ch. 268, § 2.00 [item 0520-001-0044]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 0520-001-0044].)

58. **California Postsecondary Education Commission** (Stats. 2008, ch. 268, § 2.00 [item 6420-001-0001]; Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 2.00 [item 6420-001-0001].)