[No. A127292. First Dist., Div. Two. Oct. 3, 2011.]

EDMUND G. BROWN, JR., as Governor, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
CALIFORNIA CORRECTIONAL PEACE OFFICERS ASSOCIATION
et al., Real Parties in Interest.

972

974

**COUNSEL**

Kronick, Moskovitz, Tiedemann & Girard, David W. Tyra, Kristianne T. Seargeant, Meredith H. Packer; K. William Curtis, Will M. Yamada and Joan A. Markoff for Petitioners.

No appearance for Respondent.

Carroll, Burdick & McDonough, Greg McLean Adam, Jonathan Yank, Gonzalo C. Martinez; and Daniel M. Lindsay for Real Party in Interest California Correctional Peace Officers Association.

Edmund G. Brown, Jr., Attorney General, Jonathan K. Renner, Assistant Attorney General, Zackery P. Morazzini and Ross C. Moody, Deputy Attorneys General, for Real Party in Interest John Chiang, as State Controller.

Altshuler Berzon, Stacey M. Leyton, Barbara J. Chisholm, Peder Thoreen; and Gerald James for Professional Engineers in California Government and California Association of Professional Scientists as Amici Curiae on behalf of Real Party in Interest California Correctional Peace Officers Association.

**OPINION**

**RICHMAN, J.**—This petition for a writ of mandate seeks to overturn an order by the Superior Court of Alameda County that would virtually nullify the three-day-per-month furlough program as it is applied to facilities manned by employees represented by the California Correctional Peace Officers Association (CCPOA). The trial court determined that the furlough program, which was implemented in the wake of two executive orders by the Governor, resulted in a reduction in pay for CCPOA members that violated various state statutes, specifically Government Code section 19826, Labor Code section 223, and the state's minimum wage law. The trial court directed issuance of a writ of mandate ordering that backpay be provided to CCPOA members.

After this matter was fully briefed, but before it was argued, our Supreme Court decided *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989 [116 Cal.Rptr.3d 480, 239 P.3d 1186] (*Professional Engineers*), upholding the legality of the two-day-a-month unpaid furlough time implemented following the first executive order. The core holding of *Professional Engineers* was that in enacting revisions to the Budget Act of 2008 (2008 Budget Act), the Legislature had in effect retroactively validated the furlough program by reducing the appropriated funds for the agencies whose employees were then being furloughed. In *Service Employees Internat. Union, Local 1000 v. Brown* (2011) 197 Cal.App.4th 252 [128 Cal.Rptr.3d 711] (*SEIU v. Brown*), this court held that the reasoning of *Professional Engineers* was equally applicable to the third furlough day established by the second executive order and the Legislature's revisions to the Budget Act of 2009 (2009 Budget Act). We reiterate that conclusion here.

We further conclude that the reasoning of *Professional Engineers* and *SEIU v. Brown* is incompatible with two of the statutory grounds for the trial court's order. First, *Professional Engineers* establishes that Government Code section 19826 does not invalidate the furlough program. Although the trial

court correctly determined that the furlough program resulted in a reduction of CCPOA members' pay, that reduction, accomplished by the Legislature when it revised the 2008 and 2009 Budget Acts, was within the Legislature's near plenary authority over the compensation of state employees. Second, the Legislature's revisions to the budget acts also establish no violation of Labor Code section 223—which prohibits an employer secretly "pay[ing] a lower wage while purporting to pay the wage designated by statute or by contract"—because CCPOA's members *were* being paid according to the governing statutes, in this instance, the revisions to the budget acts. We also reject CCPOA's contention that the furlough program contravenes Labor Code section 212, a measure essentially intended to prevent employers from giving employees paychecks that cannot be cashed.

Finally, we note that effective August 2010, the furlough program was amended so that there was no expiration date for previously accrued furlough days, which means there is no deadline by which CCPOA members must take their compensatory time off or lose it. Thus, assuming a public employee can make a minimum wage claim—an issue we do not decide—such a claim will not be justiciable until a particular CCPOA member has ceased employment. Thus, there is no present or ministerial duty that mandate can compel.

In light of these conclusions, we grant the Governor's petition and order the trial court to set aside its order mandating the relief sought by CCPOA.

## BACKGROUND

On December 19, 2008, Governor Arnold Schwarzenegger issued Executive Order No. S-16-08. By reason of "an approximately $15 billion General Fund deficit for the 2008–09 fiscal year, which without effective action, is estimated to grow to a $42 billion General Fund budget shortfall over the next 18 months," he directed that "effective February 1, 2009 through June 30, 2010, the Department of Personnel Administration shall adopt a plan to implement a furlough . . . for two days per month . . ." for "represented state employees," managers, and supervisors. On July 2, 2009, noting that "California's revenues . . . continue to plummet," Governor Schwarzenegger issued a second executive order, Executive Order No. S-13-09, which ordered the furlough program expanded to three days per month for the period from July 1, 2009, through June 30, 2010. Each of the executive orders was preceded by a proclamation declaring a fiscal emergency necessitated by the dire condition of the state's finances.

Pursuant to the executive orders, the Department of Personnel Administration (DPA) implemented a program that impacted the members of "Bargaining Unit 6," which is represented by CCPOA. Bargaining Unit 6 is composed of

approximately 30,000 to 35,000 state civil service employees, including 2,500 supervisory sergeants and lieutenants working at correctional facilities operated by the Department of Corrections and Rehabilitation (CDCR), the State Department of Mental Health (DMH), and the "Department of Juvenile Justice" (DJJ).[1]

In response to the Governor's executive orders, the DPA implemented a furlough program pursuant to which CDCR and DMH placed Bargaining Unit 6 members on what is called a "self-directed" furlough. That is, the members are encouraged to take their furlough hours off within each month; however, if they cannot, they are permitted to accumulate furlough leave credits to be used at a future date. The furlough program also requires that Bargaining Unit 6 members utilize accumulated furlough hours prior to utilizing other types of paid leave, including vacation, annual leave, personal leave, or holiday credits.

CCPOA sued the Governor, the DPA, the State Controller, and the three agencies (which for simplicity will be collectively designated as the Governor) employing members of Bargaining Unit 6. In its trial brief, CCPOA explained the features of the furlough system it was challenging:

"Under the authority of the Executive Orders, . . . CDCR, DMH, DJJ have implemented a 'furloughs' scheme . . . the gist of which is that: [¶] employees receive three 'furlough' day credits per month; [¶] employees theoretically

---

[1] A few words about the pleadings and the parties. It is one of the numerous contradictions and confusing peculiarities of this record that CDCR claims that Bargaining Unit 6 has approximately 2,500 more members than CCPOA acknowledges.

At the time the executive orders were issued, negotiations for a new contract—technically called a memorandum of understanding (MOU)—between CCPOA and the state had broken down. However, in accordance with the Ralph C. Dills Act (Gov. Code, §§ 3512–3524), CCPOA members continued to work according to the terms of the state's "last, best, and final offer." (Gov. Code, § 3517.8, subd. (b).) The particulars of this offer have been summarized as "continu[ing] the same schedule that was contained in [the expired] 2001–2006 MOU—a regular work schedule for most Unit Six employees of up to 164 hours in a 28-day period," with any additional hours qualifying as overtime. (*California Correctional Peace Officers Assn. v. State of California* (2010) 189 Cal.App.4th 849, 854 [117 Cal.Rptr.3d 109].) A September 2007 DPA memo describes the state's ultimate offer as (1) including "a 5 percent annual salary increase for all employees in Bargaining Unit 6 on July 1, 2007, July 1, 2008, and July 1, 2009"; (2) including increases in the state's "health benefit contribution," recruitment incentives, "recruitment and retention bonus"; and (3) increasing the differential for night and weekend shifts. The memo was explicit that all of these increases were subject to "Legislative approval."

There is no "Department of Juvenile Justice," but there is a *Division* of Juvenile Justice in the Department of Corrections and Rehabilitation. (Gov. Code, § 12838, subd. (a); Pen. Code, § 830.5, subds. (b)–(c); Welf. & Inst. Code, §§ 827.9, subd. (b)(1), 1712, subd. (a), 1982, subd. (a).) The Division of Juvenile Justice is the statutory successor to the California Youth Authority. (Gov. Code, § 12838.5.)

attempt to 'self-direct' up to three furlough days per month (i.e., take days off); [¶] every employee's pay is reduced by three days per month, or approximately 13.5%; [¶] employees who can take a furlough day have a day off without pay; [¶] employees (and this is by far the majority) who cannot use three furlough days in a month must work their normal schedule, endure the pay cut, and carry over unused 'furlough credit' balances; [¶] furlough credits have no cash value, cannot be cashed-out, and will expire if unused by June 30, 2012.[2]

"This scheme is intended to create significant salary savings for CDCR, DMH, and DJJ—however, it does so by violating two sets of laws. First, as implemented, the furlough scheme usurps the Legislature's sole authority under Government Code section 19826 and Article 3, Section 3 of the California Constitution to adjust the salaries of union-represented State employees. The 'furloughs' result in an approximate 13.5 percent reduction in salaries without a commensurate and contemporaneous reduction in hours.

"Second, because few, if any, employees are permitted to use furlough days in the month that they accrue . . . , but all employees' monthly salaries are reduced by approximately 13.5 percent, the harmed employees' only compensation for up to three days worked each month is a non-negotiable furlough credit. Put another way, *defendants unilaterally stopped paying employees for three days per month, whether the employees worked those days or not.*[3]

---

[2] The furlough program originally set June 30, 2012, as the expiration date for use of furlough credits, which was the state of affairs when the matter was decided below and at the time of the original briefing here. At oral argument, however, counsel represented that this deadline had been removed, and by joint letter provided us with a copy of an August 5, 2010 memorandum from the DPA advising, among other things, that "[e]ffective immediately, there is no longer an expiration date to previously accrued furlough hours." The memorandum reiterates the DPA's responsibility to "continue to monitor and ensure that all accrued furlough hours are exhausted prior to termination."

This is how CCPOA explained why its members were stuck with their furlough days: "Due to the 24/7 staffing needs at institutions within CDCR, the current problem of chronic understaffing, and the prohibition on the use of overtime to permit 'self-directed' furloughs, it will be impossible for CDCR to allow every employee to utilize the . . . deferred furlough days each will accrue during the period allotted. For the more than 30,000 CDCR employees represented by CCPOA alone, this would require allowing nearly one and one-half . . . million leave days, an absolute impossibility within a system where understaffing prevents employees from even using their accrued and vested leave credits. [¶] In summary, it will be impossible for CDCR employees, including those represented by CCPOA, to ever use the misnomered 'self-directed' furlough days . . . ." An additional complication is that CDCR has for several years apparently suffered a shortage of correctional officers. (See Stats. 2007, ch. 7, § 24 [legislative finding of "over 2,400 correctional staff vacancies" at CDCR]; Pen. Code, § 2063, subd. (b)(3)(A) [CDCR shall annually notify Legislature of number of correctional officer vacancies]; Historical and Statutory Notes, 32F West's Ann. Gov. Code (2011 supp.) foll. § 13340, p. 88 [2007 gubernatorial message noting " 'the need to aggressively fill [CDCR's] vacant Correctional Officer positions' "].)

[3] Not surprisingly, the Governor's description of the program differs, though there is substantial agreement about the major features. This is how he puts it: "As part of its

"In this . . . proceeding[], [CCPOA] asks this Court to issue a writ of mandate compelling Respondents to pay the harmed employees their full wages each month, *without reduction and in negotiable form,* for all time worked during the [preceding] pay period, in accordance with Respondents['] ministerial duties under Government Code section 19826 and Labor Code sections 212, 223, and 1171 et seq."

The trial court considered a mountain of material, including much statistical evidence concerning the actual operation of the furlough program as implemented in correctional facilities and applied to members of Bargaining Unit 6. The court also heard extensive argument before filing a 10-page order granting CCPOA's petition for the writ. The court's decision rested on two grounds. The first was that the "self-directed furlough program, as implemented, constitutes a salary reduction" in that "for those pay periods in which an employee works more hours than those for which he or she is compensated at the regular rate of pay constitutes a salary reduction . . . contrary to the requirements of Government Code § 19826(b)."[4]

The second ground concerned CCPOA's claim that the furlough program violated provisions of the Labor Code, with which the trial court largely agreed:

"Labor Code section 223 states: 'Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract.' It is unlawful for an employer subject to a wage rate set by statute or by contract to pay a lower wage. [Citations.] Here, the wage scales for employees represented by [CCPOA] were set by a memorandum of

implementation plan, DPA directed that certain employees working at facilities that operate 24-hours a day/7-days a week, which cannot be shut down for three Fridays a month when other state employees were being furloughed, e.g., correctional institutions and mental facilities where the majority of [Bargaining Unit] 6 employees are employed, utilize self-directed furloughs. Employees utilizing self-directed furloughs are not required to be furloughed on the first three Fridays of the month as other state employees, but rather are furloughed on days requested by the employees when it is operationally feasible for them to take their furlough days based on the needs of the institutions in which they are employed. [¶] On occasion, this has resulted in employees not being able to take their furlough days during the same pay period in which their wages are reduced to account for those furloughs. When such a situation arises, the self-directed furlough plan . . . provides that employees are given 'furlough credits,' which they can utilize at a later point in time to take a day off from work without a reduction in pay beyond that already resulting from furloughs."

[4] Statutory references are to the Government Code unless otherwise indicated. The cited statute provides: "Notwithstanding any other provision of law, the department [(DPA)] shall not establish, adjust, or recommend a salary range for any employees in an appropriate unit where an employee organization has been chosen as the exclusive representative pursuant to Section 3520.5 [of the Ralph C. Dills Act]." (§ 19826, subd. (b).)

understanding with the State which, by operation of Government Code section 3517.8, remains in effect until negotiation of a new contract, or until an impasse is reached and the state employer implements a last, best and final offer approved by the Legislature. Regardless of whether the wage scale currently in effect here is considered a contract or a wage implemented by operation of statute, Labor Code section 223 is applicable.

"Labor Code section 1171 et seq., and implementing regulations, set the minimum wage for labor in California. In determining whether the obligation to pay the minimum wage has been met, the employer may not divide the total compensation paid by the hours worked in the pay period to satisfy the minimum wage with an hourly average. [Citations.] Instead, the employer must pay at least the minimum wage for hours worked. [Citation.] Here, when correctional employees are required to work the same number of hours in the pay period, but are not paid for three days' worth of time worked, they are not paid the minimum wage for those hours worked.

"Again, the Court must conclude that for any pay period in which an employee works more hours than those for which he or she is compensated at either the regularly-established rate of pay or the minimum wage, Respondents have violated the mandatory duties imposed upon them under Labor Code sections 223 and 1711 et seq., respectively.

"Respondents' argument that the State is not bound to comply with these Labor Code sections is incorrect. Labor Code section 220 specifies those sections of the Labor Code that do not apply to state employees; neither section 223 or 1171 appear on that list. . . .

"The Court does not find that accrual of 'furlough credits' that cannot be cashed out violates Labor Code section 212. The Executive Orders and the DPA implementation memos reduced the wages of employees with the promise of time off at some later undetermined date. That promise, in the form of a furlough credit, does not constitute 'payment' for any work day. Thus, the Court does not find that writ relief based upon a violation of section 212 is warranted."

As directed by the court's order, a writ of mandate issued commanding the Governor to "perform all acts necessary to immediately and prospectively pay all employees in State Bargaining Unit 6, as well as correctional sergeants and lieutenants, their full salaries in cash or cash equivalent at the end of each pay period for all hours worked during each preceding pay period, without reduction, and at rates delineated for such classifications in the current State of California Civil Pay Service Scales, as set forth and required by, *inter alia,*

Government Code sections 19824 and 19826(b) and Labor Code section 223 and 1171·et seq." The Governor then sought review.[5]

## DISCUSSION

### *Professional Engineers* and Section 19826

The Supreme Court's opinion in *Professional Engineers* covers a great deal of ground, but its core holding is based on section 3.90 of the Legislature's revisions to the 2008 Budget Act. As pertinent here, that section provides:

" '(a) Notwithstanding any other provision of this act, each item of appropriation in this act, with the exception of those items for the California State University, the University of California, Hastings College of the Law, the Legislature (including the Legislative Counsel Bureau), and the judicial branch, shall be reduced, as appropriate, to reflect a reduction in employee compensation achieved through the collective bargaining process for represented employees or through existing administration authority and a proportionate reduction for nonrepresented employees (utilizing existing authority of the administration to adjust compensation for nonrepresented employees) in the total amounts of $385,762,000 from General Fund items and $285,196,000 from items relating to the other funds. It is the intent of the Legislature that General Fund savings of $1,024,326,000 and other fund savings of $688,375,000 in the 2009–10 fiscal year shall be achieved in the same manner described above. The Director of Finance shall allocate the necessary reduction to each item of appropriation to accomplish the employee compensation reductions required by this section.

" '(b) The Department of Personnel Administration shall transmit proposed memoranda of understanding to the Legislature promptly and shall include with each such transmission estimated savings pursuant to this section of each agreement.

" '(c) Nothing in this section shall change or supersede the provisions of the Ralph C. Dills Act (Chapter 10.3 (commencing with Section 3512) of

---

[5] The Governor did so by filing a notice of appeal from the writ and the order. The purported appeal from the writ is ineffective because the writ itself is not appealable. (See *State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 301–302, fn. 6 [76 Cal.Rptr.3d 507].) CCPOA moved to dismiss the Governor's appeal on the ground that the order did not constitute a final judgment because it did not dispose of CCPOA's claims for backpay and liquidated damages. Having already issued a stay, we filed an order in which we stated: "We have concluded that the motion to dismiss is meritorious. In light of the urgency and unique nature of the issues presented, however, we accept CCPOA's invitation to · exercise our discretion and treat the premature appeal as a petition for writ of mandate. [Citations.] CCPOA's motion to dismiss is therefore denied." We stayed the trial court's order.

Division 4 of Title 1 of the Government Code).' " (*Professional Engineers, supra*, 50 Cal.4th 989, 1044.)

■ The following is what the *Professional Engineers* court deduced from that statutory language: "In mid-February 2009—shortly after the furlough program went into effect—the Legislature enacted, and the Governor signed, legislation that revised the Budget Act of 2008 (2008 Budget Act) by, among other means, reducing the appropriations for employee compensation contained in the original 2008 Budget Act by an amount that reflected the savings the Governor sought to obtain through the two-day-a-month furlough program. The February 2009 legislation further provided that the specified reduction in the appropriations for employee compensation could be achieved either through the collective bargaining process or through 'existing administration authority.' That phrase, in the context in which the revised budget act was adopted and in light of the provision's legislative history, reasonably included the furlough program that was then in existence and that had been authorized by the current gubernatorial administration. In particular, the bill analyses considered by the Legislature made specific reference to furlough-related reductions of employee compensation costs. Under these circumstances, we conclude that the Legislature's 2009 enactment of the revisions to the 2008 Budget Act operated to ratify the use of the two-day-a-month furlough program as a permissible means of achieving the reduction of state employee compensation mandated by the act." (*Professional Engineers, supra*, 50 Cal.4th 989, 1000.)

Before reaching this conclusion, the court considered a number of constitutional and statutory arguments, none of which was deemed sufficient to establish the Governor's unilateral power to impose the furlough program. In the course of this extensive exegesis, the court spelled out the role of section 19826, which, as noted, is one of the grounds for the order under review here.

■ Section 19826 covers both state employees who are not represented (subd. (a)), and those who are represented for purposes of collective bargaining (subd. (b)). *Professional Engineers*, like this proceeding, involved only represented employees. (*Professional Engineers, supra*, 50 Cal.4th 989, 1030, 1038–1039.) The court quoted with approval the construction given section 19826 in *Department of Personnel Administration v. Superior Court* (*Greene*) (1992) 5 Cal.App.4th 155 [6 Cal.Rptr.2d 714]: "The court in *Greene* concluded that '[t]he plain language of section 19826 supports the . . . conclusion that DPA may not unilaterally decrease salaries for represented employees.' [Citation.] Further, after reviewing the structure and legislative history of the Dills Act, the court explained: 'Given that this statute denies DPA the power unilaterally to set salaries, the Legislature must have intended that unresolved wage disputes return to the Legislature for final determination.' "

(*Professional Engineers, supra*, at pp. 1019–1020.) Addressing the statute's operation when represented employees and the state had reached an impasse in bargaining, "The court in *Greene* explained . . . : '[G]iven that DPA's and the unions' authority to set salaries derives from a legislative delegation, it is not at all absurd that the Legislature would reserve its authority to act in the event of a stubborn wage dispute. . . . Considering also the highly political nature of this dispute, it makes further sense that it will be ultimately resolved in the political branch. Our conclusion is consistent with the Dills Act, which represents only a limited delegation of the Legislature's salary-setting function, and includes numerous provisions suggesting the Legislature intended to retain final determination of state salaries.' [Citation.]" (*Id.* at p. 1020.)

The *Professional Engineers* court then summarized: "*Greene* makes clear that, particularly with respect to represented state employees, *the Legislature has demonstrated a special interest in retaining (through the budget process or otherwise) ultimate control over the salary and wages of such employees.*" (*Professional Engineers, supra*, 50 Cal.4th 989, 1024, italics added.) "In view of both the purpose and the effect of the mandatory unpaid furlough plan here at issue, we conclude that, *in the absence of some other source of authority* to implement a plan involving a reduction of both worktime and pay, the authority or lack of authority of the Governor or the DPA unilaterally to institute the program must be determined under the provisions of section 19826." (*Id.* at p. 1037, italics added.)

The court went on to note that *Greene*'s analysis had to be considered in light of the Legislature's subsequent enactment of section 3517.6, part of the Ralph C. Dills Act: "[U]nder the provisions of section 3517.6, the terms and conditions embodied in an MOU supersede most of the general statutory provisions that govern the terms and conditions of state employment in the absence of an MOU, including, among many other statutes, the following: . . . section 19826 (governing the DPA's authority to establish and adjust salary ranges). Under the Dills Act, it is clear that an MOU, once approved by the Legislature (either directly . . . or through the appropriation of sufficient funds to pay the agreed-upon employee compensation), governs the wages and hours of the state employees covered by the MOU." (*Professional Engineers, supra*, 50 Cal.4th 989, 1039–1040, citation omitted.)

However, if anything, language in section 3517.6 only underscored the *Greene* court's conception of the central role of the Legislature: "In addition to the portions of section 3517.6 listing the numerous statutes that are superseded (without further legislative action) by the existence of a conflicting provision in an applicable MOU, subdivision (b) of that statute contains another clause that is relevant to the issue before us. It provides in part: 'If any provision of the memorandum of understanding requires the expenditure

of funds, those provisions of the memorandum of understanding may not become effective unless approved by the Legislature in the annual Budget Act.' Section 3517.7 follows up on the latter clause, declaring that '[i]f the Legislature does not approve or fully fund any provision of the memorandum of understanding which requires the expenditure of funds, either party may reopen negotiations on all or part of the memorandum of understanding. [¶] Nothing herein shall prevent the parties from agreeing and effecting those provisions of the memorandum of understanding which have received legislative approval or those provisions which do not require legislative approval.' By virtue of these provisions in the Dills Act, *the Legislature retained its ultimate control (through the budget process)* over expenditures of state funds required by the provisions of an MOU." (*Professional Engineers, supra,* 50 Cal.4th 989, 1042–1043, italics added; see also *id.* at p. 1038, fn. 34; *California Correctional Peace Officers' Assn. v. State of California* (2010) 181 Cal.App.4th 1454, 1459 [105 Cal.Rptr.3d 566] ["Setting compensation for public employees is a legislative function."].)

Drawing all this together, the *Professional Engineers* court observed that in enacting section 3.90 of the revisions to the 2008 Budget Act, the Legislature exercised its ultimate authority over compensation of state employees: "[W]hen the Legislature enacted, and the Governor then signed, legislation revising the 2008 Budget Act, the validity of the mandatory furlough program fundamentally changed. The new legislation explicitly reduced the 2008–2009 fiscal year appropriation for state employee compensation to a level reflecting the reduced compensation to be paid to employees under the Governor's furlough plan. By reducing the appropriation for employee compensation, the Legislature no longer had 'fully funded' the provisions of the MOU's supporting the higher level of pay that previously had been approved, and thus, under sections 3517.6 and 3517.7, the provisions of the applicable MOU's that supported the higher level of pay the employees had been receiving prior to the implementation of the furloughs no longer were effective." (*Professional Engineers, supra,* 50 Cal.4th 989, 1043.)[6]

---

[6] The court then made a "Cf." reference to *White v. Davis* (2003) 30 Cal.4th 528, 572–573 [133 Cal.Rptr.2d 648, 68 P.3d 74]. The cited pages are unusually pregnant with meaning, because the Supreme Court stated that approval of a multiyear MOU does not require the Legislature to make an annual appropriation to provide "the funds required by the agreement." Similarly, at earlier points in its opinion the *White* court emphasized that "the employment rights of state employees reasonably must be viewed as including a condition that the actual payment of an employee's salary is dependent upon the existence of an available appropriation" (*id.* at p. 569), and that the constitutional guarantee against the impairment of contracts (Cal. Const., art. I, § 9) "does not afford state employees the right to obtain the actual payment of salary . . . prior to the enactment of an applicable appropriation" (*White v. Davis, supra,* at p. 571).

Other parts of *White v. Davis* are equally pertinent. For example, construing section 1231, the court held that that statute "establishes that the employment relationship between the state

■ The court then concluded that the term "existing administrative authority" used in the revisions to the 2008 Budget Act "most reasonably is understood as embodying a legislative decision to permit the mandated reductions in employee compensation to be achieved through the then existing furlough plan," even as applied to represented employees. (*Professional Engineers, supra,* 50 Cal.4th 989, 1044–1046.) "By enacting this provision [(i.e., § 3.90)], the Legislature, *through the exercise of its own legislative prerogative,* authorized the substantial reduction in the appropriations for employee compensation, mandated in the revised budget legislation, to be achieved through the two-day-a-month furlough plan." (*Id.* at pp. 1047–1048.) And, once more: "Section 19826 places no limitation upon *the Legislature's authority* to increase or reduce the pay or salaries of state employees, and section 3.90 [of the revised 2008 Budget Act] simply represents an exercise of the Legislature's reserved authority over state-employee compensation." (*Id.* at pp. 1050–1051.)

This result was not contrary to the Ralph C. Dills Act: "Although, as we have discussed above, the Dills Act does not permit *the Governor or the DPA* unilaterally to impose a mandatory unpaid furlough for represented employees (in the absence of an authorizing provision in an applicable MOU, unless the parties have reached an impasse in negotiations),[7] nothing in the Dills

and state employees is *not* dependent upon the passage of the annual budget bill and continues to exist during a budget impasse, and further provides that the conditions of employment—including an employee's salary—remain in effect during the budget impasse. . . . [H]owever, section 1231 does *not* indicate a legislative intent to authorize *the actual payment* of salary to employees prior to the passage of a budget act that includes a requisite appropriation of funds for such salaries." (*White v. Davis, supra,* 30 Cal.4th 528, 568.) Indeed, the court went on to reject the argument that one of the conditions of public employment was "a public employee's right to the *timely* payment of salary," and then noted that "Labor Code section 204, which imposes an obligation of timely payment of wages upon employers in California generally, is not applicable to the payment of wages of employees who are directly employed by the state. (Lab. Code, § 220.)" (*White v. Davis, supra,* at pp. 568–569, fn. 16; cf. *Meyer v. Riley* (1934) 2 Cal.2d 39, 41–42 [38 P.2d 405] ["there may exist an impossibility of payment of the salary of a state officer from any *budget* . . . and still be authority otherwise in law for the payment thereof"]; *Glib v. Chiang* (2010) 186 Cal.App.4th 444, 471 [111 Cal.Rptr.3d 822] ["DPA has authority to issue directions to the Controller regarding deferral of employee salary payments in the event that appropriations are lacking due to a budget impasse"].) Moreover, "the federal constitutional contract clause does not provide any support for the employees' claim, and . . . there is no violation of the federal due process clause . . . because the state has not deprived the employees of a right they otherwise possess." (*White v. Davis, supra,* at p. 574.) If the Legislature retains the authority not to " 'fully fund' " an existing MOU (*Professional Engineers, supra,* 50 Cal.4th 989, 1043), that same authority is surely at least as great when the MOU has expired. In that situation, another consequence would seem to be that state employees' salary demands would be even less enforceable after the parties have reached an impasse.

[7] Which was not the case in *Professional Engineers,* "because the parties had not reached an impasse in their negotiations over a new MOU." (*Professional Engineers, supra,* 50 Cal.4th 989, 1040.)

Act precludes *the Legislature* from adopting such a furlough plan through a legislative enactment as one method of reducing the compensation of state employees when such cuts are found necessary and appropriate in light of the state's fiscal condition. [Citations.] If, as we have concluded, the Legislature agreed to permit the reduction in the appropriations for employee compensation embodied in the revised 2008 Budget Act to be achieved either through the collective bargaining process or through the two-day-a-month furlough plan, the adoption of such a legislative provision did not operate to change or supersede the provisions of the Dills Act." (*Professional Engineers, supra*, 50 Cal.4th 989, 1048.)

Nor did the compensation reduction violate the single subject-rule of article IV, section 9 of the California Constitution. That section of the revised budget "does not substantively amend or change any existing statutory provision or expand or restrict the substantive authority" heretofore granted. "In particular, section 3.90 of the revised 2008 Budget Act does not alter the provisions of Government Code section 19826 . . . ." Thus, there was no "substantive policy change 'masquerading as [a] Budget Act provision[].' " (*Professional Engineers, supra*, 50 Cal.4th 989, 1049–1050.)

■ The discussion in *Professional Engineers* concerning section 19826 was quoted to demonstrate that, although it did not base its actual holding on that statute, the court did undertake an extensive examination of its purpose and scope. Again and again, the Supreme Court left no doubt that on the subject of state employee compensation, the Legislature is the branch of government that is supreme. It is only the Legislature's partial delegation of that power which gives the DPA the authority to negotiate with unions representing state employees, an authority that is only exercised subject to the Legislature's "special interest in retaining . . . ultimate control over the salary and wages of [state] employees." (*Professional Engineers, supra*, 50 Cal.4th 989, 1024; see *id.* at pp. 1019–1020, 1038, fn. 34, 1040, 1042–1043.) The Legislature exercised that authority when it revised the 2008 and 2009 Budget Acts. The passage of those enactments undermines the first ground of the trial court's decision.

On several points, the trial court here was on the right track. It concluded that the furlough program did effect "a salary reduction." So did the Supreme Court. (*Professional Engineers, supra*, 50 Cal.4th 989, 1037 ["the furloughs clearly did significantly reduce . . . wages or salary . . ."].) And, citing *Greene*'s construction of section 19826, subdivision (b), the trial court concluded that "The statute bars DPA from reducing state employees' salaries, reserving such decisions to the Legislature," which accords with how the Supreme Court viewed the matter. What the trial court did not include in its analysis was the impact of the revisions to the 2008 Budget Act, enacted 10

months earlier.[8] Nor, in fairness, can the trial court be faulted for lacking the clairvoyance to anticipate the reasoning the Supreme Court would adopt 10 months later in *Professional Engineers*. The trial court and CCPOA correctly recognized that the ultimate authority belonged to the Legislature. However, not having the benefit of *Professional Engineers*, they did not realize that the Legislature had already exercised that authority in a manner that ratified the salary reductions imposed as a consequence of the furlough program. In sum, time and events have overtaken CCPOA's claim that "the furlough scheme usurps the Legislature's sole authority under Government Code section 19826 . . . ."

### CCPOA's Efforts to Distinguish *Professional Engineers* Are Not Persuasive

Obviously fearing that section 19826 will be given the construction we believe was intended by the Supreme Court, CCPOA advances a number of arguments it hopes will avert defeat by blunting the impact of *Professional Engineers*. These arguments are unavailing.

CCPOA first contends that *Professional Engineers* is not controlling because it did not "approve" the third furlough day added by Governor Schwarzenegger's second executive order. CCPOA next asserts that *Professional Engineers* involved a facial challenge to the legality of the furlough program and, accepting that validity, disputes only "the manner of implementation of the Unit 6 'self-directed' program to the extent it resulted in employees receiving no pay for actual hours worked or payment in the form of a furlough credit with no cash value," this in violation of Labor Code provisions. Interestingly, in the course of this argument CCPOA acknowledged that "As CCPOA explained in its prior briefing, this case does not challenge the Governor's authority to implement furloughs. Instead, CCPOA challenges the manner of implementation of the Unit 6 'self-directed' program to the extent it resulted in employees receiving no pay for actual hours worked or payment in the form of a furlough credit with no cash value." At this point CCPOA stated in a footnote: "Thus this case only concerns Unit 6 employees who could not timely take furlough days."[9]

CCPOA also asserts that unlike *Professional Engineers*, the trial court here made a number of factual findings concerning the operation of the furlough program and its impact upon CCPOA members in Bargaining Unit 6. Based on those findings, CCPOA argues that because the manner in which the

---

[8] We hasten to add that none of the parties addressed the impact of the Budget Act revisions in their voluminous filings in the trial court.

[9] We view this as a concession that some CCPOA members were properly furloughed, at least for the two days upheld in *Professional Engineers*.

furlough program is being applied does change and expand the authority of executive branch officials administering the existing program, the Legislature could not ratify it in its budgetary revisions without violating the single-subject rule.

Concerning the Legislature's revisions to the 2008 and the 2009 Budget Acts that validated the existing furlough program, CCPOA contends that "the Legislature's approval . . . could only encompass (1) a reduction in hours worked by employees and (2) a commensurate reduction in pay—in accordance with the furlough[] program Defendants proposed and purported to implement—and could not have reasonably have included approving reduced and fluctuating hourly rates for employees who are unable to take timely furlough days." If the Legislature is held to have ratified this power in the DPA, CCPOA argues, it will amount to a violation of the "single subject" rule of article IV, section 9 the California Constitution.

If CCPOA understandingly adopts a minimalist view of *Professional Engineers*, the Governor just as naturally gives it a maximalist reading. Based on *Professional Engineers* treating the Legislature's budget act revisions as ratifying the furlough program *as it was then being operated*, the Governor submits that "*Professional Engineers* resolves all challenges to the self-directed furloughs," including those raised by CCPOA.

We have already considered some of these arguments in *SEIU v. Brown, supra*, 197 Cal.App.4th 252. Among other things, we concluded that the logic of *Professional Engineers* was sufficient to reach the expanded furlough program. Where *Professional Engineers* saw in section 3.90 in the revised 2008 Budget Act legislative ratification of the two-day-a-month furlough implemented pursuant to first executive order, we saw the Legislature's adoption of the virtually identical version of section 3.90 in the revised 2009 Budget Act (see Stats. 2009, 4th Ex. Sess. 2009–2010, ch. 1, § 3.90) as a further ratification of the expanded furlough program implemented after the Governor had issued the second executive order adding the third day. We concluded that just as the term "existing administrative authority" used in the first section 3.90 was construed in *Professional Engineers* as legislative ratification of the then existing two furlough days, the same language in the second version must be deemed to ratify the furlough program that had by now been expanded to three days, but only to the extent there was "an item of appropriation" in the budget act that was being reduced by the Legislature. (*SEIU v. Brown, supra*, at pp. 265–269.) This defeats CCPOA's initial argument.

On the other hand, the Governor's assertion that the lawful scope of the furlough program is coextensive with the scope of his executive orders also

fails. Although we gave *Professional Engineers* a reach expanded beyond its literal language because of its underlying logic, we could not make it stretch as far as the Governor desired there—and desires here. Because we read *Professional Engineers*'s legislative ratification approach as premised on the reduction of an "item of appropriation," it followed there could be no ratification if there was no "item of appropriation" to reduce. Thus, if a state agency was not funded at least in part by an "item of appropriation" in the budget act, there could be no legislative ratification for that agency's inclusion in the furlough program. In other words, furloughing state employees could not be validated solely by reference to unilateral actions by the Governor. (*SEIU v. Brown, supra*, 197 Cal.App.4th 252, 267–268.) That said, each of the three state agencies at which CCPOA members are employed is covered by an item of appropriation in the 2008 and 2009 Budget Acts.[10] Therefore, CCPOA members employed by those agencies were validly included in the expanded furlough program.

With respect to CCPOA's argument concerning the nature of its challenge to the furlough program, it is true that the Supreme Court in *Professional Engineers* was considering the legality of "an across-the-board mandatory unpaid furlough [program]" that resulted in an "across-the-board reduction of state employees' wages or earnings" (*Professional Engineers, supra*, 50 Cal.4th 989, 1035, 1030). Put otherwise, *Professional Engineers* addressed the general legality of the furlough program, and the court was painting with a broad brush, with the Labor Code never mentioned. Therefore, we are inclined to accept CCPOA's characterization that *Professional Engineers* dealt with a facial challenge to the furlough program, and that CCPOA is mounting an "as applied"[11] challenge. Thus, we cannot agree with the Governor's assessment that *Professional Engineers* "resolves any [and] all challenges to the use of self-directed furloughs." We also recall the reason we transmuted this attempted appeal into a writ proceeding: because of "the urgency and the unique nature of the issues." The state's parlous fiscal

---

[10] As previously mentioned, two of the three agencies are actually only one, because the *Division* of Juvenile Justice—not the *Department* of Juvenile Justice named in CCPOA's petition—is a part of CDCR. (See fn. 1, *ante*.) For items of appropriation for CDCR, see Statutes 2008, chapter 268, section 2.00 (item 5225-001-0001 in the 2008 Budget Act) and Statutes 2009, 4th Extraordinary Session 2009–2010, chapter 1, section 388 (item 5225-001-0001 in the 2009 Budget Act). For DMH, see Statutes 2008, chapter 268, section 2.00 (item 4440-001-0001 in the 2008 Budget Act) and Statutes 2009, 4th Extraordinary Session 2009–2010, chapter 1, section 361 (item 4440-001-0001 in the 2009 Budget Act).

[11] "A facial challenge to the . . . validity of a statute . . . considers only the text of the measure itself, not its application to . . . particular circumstances of an individual." [Citation.] . . . [¶] An as applied challenge . . . contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute . . . has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].)

situation has not lessened since the trial court made its ruling, and the furlough program was extended into 2011 by a third executive order. (Governor's Exec. Order No. S-12-10 (July 28, 2010).) In these circumstances, we do not believe the public good is served by deferring questions about the legality of the furlough program as applied to one of the larger bargaining units, particularly one staffing institutions so immediately and intimately connected to public safety.

### The Furlough Program Does Not Violate Labor Code Section 223

The second ground on which the trial court based its decision was that "the self-directed furlough program, as implemented, violates mandatory duties under Labor Code section 223."

■ Labor Code section 223 provides: "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract." Section 223 is aimed at employer fraud and deceit on the theory that to subject an employee's expected wage "to unanticipated or undetermined deductions is to impose a special hardship on the employee." (*Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319, 328–329 [19 Cal.Rptr. 492, 369 P.2d 20].) As our colleagues in Division Three aptly described it, this statute "was enacted to address the problem of employers taking secret deductions or 'kickbacks' from their employees. [Citations.] In such cases, the employer nominally pays employees the wage required by a statute or collective bargaining agreement but then secretly deducts amounts or requires employees to pay back a portion of the wages, so that in reality the employees are earning less than was required. [Citations.] However, in all of the cases the underpayment of wages is a secret being *kept from applicable enforcement authorities*—i.e., the Labor Commissioner, the employee's union [citation], or a contracting party [citation]—not from the employees themselves, who presumably are well aware of how much they are paid. [¶] . . . [T]he statute punishes secret underpayment." (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1205 [78 Cal.Rptr.3d 572].)

We conclude Labor Code section 223 is not applicable, for two reasons.

First, there never was anything secret about the furlough program. Quite the contrary: it was introduced by executive orders announced with a fanfare of publicity; it was implemented by DPA leaving a paper trail of explanatory memoranda a mile long; and it was almost instantly subjected to multiple judicial challenges. (See *Professional Engineers, supra*, 50 Cal.4th 989, 1001–1004.)

■ Second, at the time the trial court made its decision, this was not a situation dealing with a "wage scale . . . designated by statute or by contract" within the plain language of section 223. There was no contract, because the MOU between CCPOA and the state had expired. (See fn. 1, *ante.*) The only obvious statute dealing with the wages CCPOA members would be paid was the 2001 statute approving and adopting the contract that expired in 2006; even so, this was merely an incorporation by reference of "the memorandum of understanding . . . entered into by the state employer and State Bargaining Unit 6 [of] the California Correctional Peace Officers Association." (Stats. 2002, ch. 1, §§ 1–4, p. 3.) There is nothing like a "designated wage scale" matching salaries to the various job classifications filled by CCPOA members. Subdivision (b) of section 3517.8 does not count, because it merely allows for the state's "last, best, and final offer" to substitute for an expired MOU if negotiations have reached an impasse. However, as every first year law student learns, an offer is not a contract. (*People v. Pereira* (1989) 207 Cal.App.3d 1057, 1076 [255 Cal.Rptr. 285]; *Citizens Nat. Life Ins. Co. v. Murphy* (1913) 154 Ky. 88 [156 S.W. 1069, 1070]; *Weaver v. Burr* (1888) 31 W.Va. 736 [8 S.E. 743, 747].) In sum, the only contract was no longer in effect, and the only statute is section 3517.8, subdivision (b), which is simply a means of preventing a rupture in the provision of vital services.

■ We also reject CCPOA's argument that Labor Code section 223 "is the mechanism to enforce wage scales set by means other than an operative MOU" in situations where "the wage scale remains fixed by statute—i.e., Government Code section 19826(b)." Subdivision (b) of section 19826 is clearly meant to allow the ordinary collective bargaining process to operate. When that process reaches the extraordinary situation of a collective bargaining impasse, "the mechanism to enforce wage scales set by means other than an operative MOU" is not Labor Code section 223, but section 3517.8, subdivision (b), which permits the employment relationship to continue according to the terms of the state's "last, best, and final offer."[12]

### It Is Premature to Determine Whether the Furlough Program Violates the Minimum Wage Law

"The Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission

---

[12] In light of this conclusion, we do not view CCPOA's argument as strengthened by reliance on Labor Code section 222, which provides: "It shall be unlawful, in case of any wage agreement arrived at through collective bargaining, either willfully or unlawfully or with intent to defraud an employee, a competitor, or any other person, to withhold from said employee any part of the wage agreed upon." This statute, which CCPOA characterizes as "the companion statute [to Labor Code section 223] for enforcing operative MOU wage rates," is clearly predicated on the existence of an "operative MOU" that was "arrived at through collective bargaining." The relevance of this statute when the parties are at an impasse is not apparent.

legislative, executive, and judicial powers." (Cal. Const., art. XIV, § 1.) The state's minimum wage has been $8 per hour since January 1, 2008. (Lab. Code, § 1182.12.) The trial court held that the minimum wage law was violated, reasoning as follows: "[W]hen correctional employees are required to work the same number of hours in the pay period, but are not paid for three days' worth of time worked, they are not paid the minimum wage for those hours worked. [¶] . . . [A]ny pay period in which an employee works more hours than those for which he or she is compensated at either the regularly-established rate of pay or the minimum wage" is a violation of the minimum wage law.

As CCPOA explained at oral argument, its minimum wage claim applies to those CCPOA members who did not take their furlough days within the month. So, the argument runs, they were not paid in accordance with section 19824, subdivision (a) which provides as follows: "Unless otherwise provided by law, the salaries of state officers shall be paid monthly out of the General fund." And, CCPOA argues, any member who did not take his or her three furlough days within the month is not "paid monthly."

The Governor contends that the minimum wage statutes "do not create mandatory ministerial duties the alleged violation of which can be remedied through issuance of a writ of mandate." We do not address, and express no opinion on, the merits of this contention, nor, indeed, on the question whether a state employee can even bring a minimum wage claim.[13] Assuming without deciding that CCPOA members can assert a claim for violation of the minimum wage law, no such claim can yet be determined. And no writ can issue.

■ Our Supreme Court has held that two basic requirements are essential to the issuance of the writ of mandate: (1) a clear, present, and usually ministerial duty upon the part of the respondent and (2) a clear, present, and beneficial right in the petitioner to the performance of that duty. (E.g.,

---

[13] See Labor Code section 220 (listing requirements applicable "to the payment of wages" that "do not apply to . . . employees directly employed by the State of California"); cf. *Johnson v. Arvin-Edison Water Storage Dist.* (2009) 174 Cal.App.4th 729, 733 [95 Cal.Rptr.3d 53] ("unless Labor Code provisions are specifically made applicable to public employers, they only apply to employers in the private sector"); *California Correctional Peace Officers' Assn. v. State of California* (2010) 188 Cal.App.4th 646 [115 Cal.Rptr.3d 361] (Lab. Code, §§ 226.7 and 512 do not apply to public employees, and correctional officers are thus not entitled to meal periods); *Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289 [120 Cal.Rptr.3d 442] (part-time instructor with regional occupational program could assert claim under minimum wage law for unpaid preparation time).

Kavanaugh v. West Sonoma County Union High School Dist. (2003) 29 Cal.4th 911, 916 [129 Cal.Rptr.2d 811, 62 P.3d 54]; *Loder v. Municipal Court* (1976) 17 Cal.3d 859, 863 [132 Cal.Rptr. 464, 553 P.2d 624]; *California Correctional Supervisors Organization, Inc. v. Department of Corrections* (2002) 96 Cal.App.4th 824, 827 [117 Cal.Rptr.2d 595].) The burden of proving these requirements was on CCPOA. (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1153–1154 [43 Cal.Rptr.2d 693, 899 P.2d 79].) "In the absence of a showing of this correlative duty and right, the writ will be denied." (8 Witkin, Cal. Procedure (5th ed. 2008) Extraordinary Writs, § 74, p. 954.)

■ "Wages" is a protean term. It is statutorily defined as "all amounts for labor performed." (Lab. Code, § 200, subd. (a).) "Courts have recognized that 'wages' also include those benefits to which an employee is entitled as a part of his or her compensation, including money, room, board, clothing, vacation pay, and sick pay." (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103 [56 Cal.Rptr.3d 880, 155 P.3d 284]; see *Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1972) 24 Cal.App.3d 35, 44 [100 Cal.Rptr. 791].) But the payout of some of these forms of compensation need not be handed over at once, and may be deferred to a later time. (See, e.g., *Suastez v. Plastic Dress-Up Co.* (1982) 31 Cal.3d 774, 780 [183 Cal.Rptr. 846, 647 P.2d 122] ["vacation pay is similar to pension or retirement benefits, another form of deferred compensation"]; *Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 31 [157 Cal.Rptr. 706, 598 P.2d 866] ["an ordinance or statute may lawfully provide that rights to cash compensation for overtime accrue only if time off credits are unused at retirement"]; Lab. Code, § 227.3 ["whenever . . . an employee is terminated without having taken off his vested vacation time, all vested vacation time shall be paid to him as wages . . ."].) Thus, not all that constitutes "wages" may be payable to the employee immediately upon being earned.

It should also be remembered that we are dealing here with the state, which is sometimes treated differently than a private sector employer. For example, private employers are generally required to pay employees twice a month. (Lab. Code, § 204.) The state, however, is exempted from this requirement. (Lab. Code, § 220, subd. (a); *White v. Davis, supra*, 30 Cal.4th 528, 568–569, fn. 16.) And we have already seen that state employees may be significantly inconvenienced by negotiating impasses and the failure to pass a budget on time. (See fns. 1 & 6, *ante*.)

■ It is undisputed that the furlough days have no cash value, and are akin to time off credit. While not paid time off, the furlough days still have value—they count as time served for purposes of computing service length for retirement. As part of the wage and benefits package extended to state

employees, it was within the state's power to specify the conditions under which they could be used. In short, furlough days are a species of deferred compensation, a concept well embedded in the state employer-employee matrix.

As discussed above, the original deadline of June 2012 has been removed, so it would appear that CCPOA members can use their furlough days at any time during the duration of their employment. (See fn. 2, *ante.*) And it will not be until cessation of that employment that the scope of any claim for unpaid minimum wage can be known with certainty; only then might such a claim accrue. (See *Longshore v. County of Ventura, supra,* 25 Cal.3d 14, 31 ["credits earned under a condition requiring that they must be compensated within a time certain, would accrue immediately upon expiration of the time described"]; *Abbott v. City of Los Angeles* (1958) 50 Cal.2d 438, 463 [326 P.2d 484] ["the right to sue for each pension instalment commences to run from the time when that instalment falls due"].) Only then might the state have a clear, present, and ministerial duty to pay those CCPOA members who have unexpended furlough hours. (*Kavanaugh v. West Sonoma County Union High School Dist., supra,* 29 Cal.4th 911, 916; *Loder v. Municipal Court, supra,* 17 Cal.3d 859, 863.) In sum, not until then will CCPOA be able to establish whether any individual member has a claim, let alone one enforceable by mandate. (*California Correctional Peace Officers Assn. v. State Personnel Bd., supra,* 10 Cal.4th 1133, 1153–1154; 8 Witkin, Cal. Procedure, *supra,* Extraordinary Writs, § 79, p. 963 ["A mere anticipated refusal to perform a possible or probable future duty is not enough . . ." to justify mandate].)

## The Furlough Program Does Not Violate Labor Code Section 212

Despite prevailing below, CCPOA also attacks a part of the trial court's ruling, contending that the court erred in concluding that the furlough program does not amount to a violation of Labor Code section 212. Before addressing the merits of this contention, we wish to express a few thoughts about why we do so.

This transmuted writ petition began as an imperfect appeal. It was CCPOA that brought our attention to the defective status of the Governor's attempted appeal with a motion to dismiss. Once we advised the parties that the matter would be treated as an original proceeding, there was no point to CCPOA filing its own notice of appeal, nor did it file its own petition for a writ to

overturn this portion of the trial court's decision. Instead, CCPOA appears to have assumed that it could contest this point within the context of the writ proceeding initiated by the Governor by virtue of Code of Civil Procedure section 906, which, among other things, provides: "The respondent, or party in whose favor the judgment was given, may, without appealing from such judgment, request the reviewing court to and it may review any of the foregoing matters [(i.e., 'any intermediate ruling, proceeding, order or decision which involves the merits')] for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken." This provision would ordinarily allow CCPOA, if it was the respondent on an appeal, to assert that, even if we decided the stated grounds for the trial court's ruling were erroneous, and if the trial court additionally erred in construing Labor Code section 212, this latter error might establish that CCPOA was nevertheless entitled to relief.

However, this is not an appeal, and CCPOA is not the respondent, so the provision would not, on its face, appear to be applicable. Nevertheless, several factors persuade us to relax the ordinary rules of review and review CCPOA's contention. We are not unmindful of the unusual procedural posture of this matter, and that *Professional Engineers* required a complete reorientation of both parties' litigation strategies. In addition, the Governor responded to the merits of CCPOA's contention without challenging its right to raise the matter. In light of these considerations, we conclude our discretion is most appropriately exercised by considering CCPOA's argument that Labor Code section 212 was misconstrued by the trial court—an argument we now reject, agreeing with the trial court that CCPOA failed to establish a violation of that statute.

Labor Code section 212 provides:

"(a) No person, or agent or officer thereof, shall issue in payment of wages due, or to become due, or as an advance on wages to be earned:

"(1) Any order, check, draft, note, memorandum, or other acknowledgment of indebtedness, unless it is negotiable and payable in cash, on demand, without discount, at some established place of business in the state, the name and address of which must appear on the instrument, and at the time of its issuance and for a reasonable time thereafter, which must be at least 30 days, the maker or drawer has sufficient funds in, or credit, arrangement, or understanding with the drawee for its payment.

"(2) Any scrip, coupon, cards, or other thing redeemable, in merchandise or purporting to be payable or redeemable otherwise than in money.

"(b) Where an instrument mentioned in subdivision (a) is protested or dishonored, the notice or memorandum of protest or dishonor is admissible as proof of presentation, nonpayment and protest and is presumptive evidence of knowledge of insufficiency of funds or credit with the drawee.

"(c) Notwithstanding paragraph (1) of subdivision (a), if the drawee is a bank, the bank's address need not appear on the instrument and, in that case, the instrument shall be negotiable and payable in cash, on demand, without discount, at any place of business of the drawee chosen by the person entitled to enforce the instrument."

■ The accepted purpose of Labor Code section 212 is to prevent employers from paying wages "by giving orders . . . payable only in goods, or orders of an indefinite nature not payable on demand, but at some future time" (*In re Ballestra* (1916) 173 Cal. 657, 658 [161 P. 120]), or paychecks which cannot be honored because of the drawee's insufficient funds. (*People v. Hampton* (1965) 236 Cal.App.2d 795, 801–802 [46 Cal.Rptr. 338]; *People v. Turner* (1957) 154 Cal.App.2d Supp. 883, 885–886 [316 P.2d 781].) Those three cited cases represent the sum total of reported California decisions discussing this statute in the 75 years of its existence. And all have done so within the context of criminal prosecutions, because Labor Code section 215 makes it a misdemeanor to violate Labor Code section 212.

CCPOA argues that "furlough credits are not meaningfully different from the non-wage forms of payment discussed in *Hampton* and outlawed by Section 212." But we are not considering scrip for the company store, rubber checks, or criminal liability. As the Governor aptly puts it, "[t]here is no issue in this case involving the State's payment of wages to [Bargaining Unit 6] employees with checks drawn on accounts with insufficient funds." We thus agree with the Governor that section 212 has no applicability here, and does not create a ministerial duty warranting the issuance of a writ of mandate.

## CCPOA Has Not Established Any Violation of the Single Subject Rule

■ In *Professional Engineers* the Supreme Court restated the established principle that " ' " ' "the budget bill may deal only with the one subject of appropriations to support the annual budget," ' and thus ' "may not constitutionally be used to grant authority to a state agency that the agency does not otherwise possess" ' or to " 'substantively amend[] and chang[e] [e]xisting statute law." ' " ' " (*Professional Engineers, supra*, 50 Cal.4th 989,

998

1049.) We have already seen that there is no violation of Labor Code section 223, including because the MOU with represented employees has expired, and the employees are paid according to the state's last, best, and final offer, as provided by section 3517.8, subdivision (b).

That statute provides in pertinent part: "If the Governor and the recognized employee organization reach an impasse in negotiations for a new memorandum of understanding, the state employer may implement any or all of its last, best, and final offer. Any proposal in the state employer's last, best, and final offer that, if implemented, would conflict with existing statutes or require the expenditure of funds shall be presented to the Legislature for approval and, if approved, shall be controlling without further legislative action . . . ." (§ 3517.8, subd. (b).) We know that the state's last, best, and final offer was implemented in September 2007 (see *California Correctional Peace Officers Assn. v. State of California, supra,* 189 Cal.App.4th 849, 853–854), and was approved when the agencies were funded by the 2008 and 2009 Budget Acts (see fn. 10, *ante*).

■ Based on the distinction between a facial and CCPOA's claimed as-applied challenge (see fn. 11, *ante*), CCPOA insists that "the Legislature did not ratify an hourly wage reduction and could not have delegated such authority to defendants without violating the single subject rule." We do not believe this argument is tenable in light of the following language in *Professional Engineers*: "[S]ection 3.90 of the revised 2008 Budget Act does not alter the provisions of Government Code section 19826 or purport to grant the Governor or the DPA authority to impose unpaid furloughs unilaterally, but rather embodies the Legislature's determination that *the two-day-a-month furlough plan is a permissible means by which the specific reductions set forth in section 3.90 may be implemented.* Section 19826 places no limitation upon *the Legislature's authority* to increase or reduce the pay or salaries of state employees, and section 3.90 simply represents an exercise of the Legislature's reserved authority over state-employee compensation. Past budget acts have included similar provisions directing that an increase in appropriations for employee compensation set forth in the budget act be implemented in a particular manner specified by the Legislature, even when the DPA or its predecessor (the State Personnel Board) would not have had authority to make those particular salary adjustments itself under the existing statutory provisions [citation], and those budget act provisions *never have been viewed as violating the single subject rule.*" (*Professional Engineers, supra,* 50 Cal.4th 989, 1050–1051, fns. omitted, italics added & omitted.)

The import of this language admits of no ambiguity. It was the Legislature that acted. There could be no question of delegation because the Legislature's action essentially took the place of whatever was already in place. The DPA

did nothing thereafter, so there was no delegation to the executive branch of the power that the Legislature had already exercised. *Professional Engineers*, while conceding that in practical reality the furloughs did amount to a salary reduction, was nevertheless fairly explicit in explaining why the furlough program was not statutorily unauthorized once it was ratified *by the Legislature*. This is why the budget acts do not violate section 19826.

CCPOA insists that the single-subject rule has been violated if the budget acts are construed to validate the " 'self-directed' " furloughs imposed on Bargaining Unit 6 members in that "the Legislature never authorized the reduction of Unit 6 employees' hourly wages." At first glance, one can hardly think the Legislature intended anything else. Nor can doubt be entertained as to the Legislature's power to reduce the compensation of represented employees, not only during a labor dispute impasse, but also while the state is unable to pass a budget. (See authorities cited in fn. 6, *ante*.)

CCPOA fleshes out its argument by noting that in *Professional Engineers* "the Supreme Court did not consider whether the single subject rule would prevent the Legislature, in a budget bill, from approving actions violating or overriding the statutes before this Court," specifically, section 19824,[14] Labor Code sections 212, 223, and 1171 et seq. because "[u]nlike section 19826(b), these statutes do not contain reservations of legislative power."

It has already been demonstrated that no violation of Labor Code section 212 or 223 is shown by passage of the revised 2008 and 2009 Budget Acts, so CCPOA's single-subject argument cannot rely on these statutes. On the other hand, the Governor's argument overlooks not only the on-its-face versus as-applied distinction we have already recognized, but also the entrenched principle of appellate law that decisions are not conclusive on issues not actually examined (*Sonic-Calabasas A, Inc. v. Moreno* (2011) 51 Cal.4th 659, 694, fn. 14 [121 Cal.Rptr.3d 58, 247 P.3d 130]; *Hart v. Burnett* (1860) 15 Cal. 530, 598)—and, as previously mentioned, there was no mention of any Labor Code provision in *Professional Engineers*. The sole remaining basis for CCPOA's single-subject argument is the minimum wage claim which, assuming it can be framed in a viable form, is not justiciable at this time. Until such a claim can be stated in a cognizable form, its hypothetical and speculative nature would therefore be a wholly inappropriate basis at present for deciding whether the furlough program as administered before and after *Professional Engineers* establishes a violation of the single-subject rule.

---

[14] The relevant portion of this statute provides: "Unless otherwise provided by law, the salaries of state officers shall be paid monthly out of the General Fund." (§ 19824, subd. (a).) As already seen, this provision cannot be given a literal application "during the period of a budget impasse." (*White v. Davis, supra*, 30 Cal.4th 528, 569, fn. 16.) In recent years, and certainly during the time of the furlough program's operation, such impasses have become a feature of summer.

## DISPOSITION

The purported appeals are dismissed. Let a peremptory writ of mandate issue directing the Superior Court of Alameda County to (1) recall its writ of mandate, (2) set aside its order granting the petition, and (3) enter a new order or judgment denying the petition. The parties shall bear their respective costs. The stay previously imposed shall remain in effect until the remittitur issues.

Kline, P. J., and Lambden, J., concurred.

A petition for a rehearing was denied November 2, 2011, and the opinion was modified to read as printed above. The petition of real parties in interest for review by the Supreme Court was denied December 21, 2011, S197935. Werdegar, J., did not participate therein.